## 2014-5045

# United States Court of Appeals
# for the Federal Circuit

ENGLEWOOD TERRACE LIMITED PARTNERSHIP,
a Michigan Limited Partnership,

*Plaintiff – Appellant,*

*v.*

UNITED STATES,

*Defendant – Appellee.*

*On Appeal from the United States Court of Federal Claims in Case No.
1:03-CV-02209, Judge Marian Blank Horn.*

## BRIEF FOR PLAINTIFF-APPELLANT
## ENGLEWOOD TERRACE LIMITED PARTNERSHIP

DON S. SAMUELSON
1745 Broadland Lane
Lake Forest, Illinois 60045
(847) 420-1732
DSSA310@aol.com

*Counsel for Plaintiff-Appellant*

APRIL 21, 2014

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*Englewood Terrace Limited v. US,* 2014-5045

## CERTIFICATE OF INTEREST

Counsel for the Appellant, Englewood Terrace Limited Partnership, certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

   Englewood Terrace Limited Partnership

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   None

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   Peter Baugher, Schopf & Weiss. Chicago. Trial Lawyer in Court of Federal Claims
   Brian Murray, Jones Day. Chicago. Oral Argument in First Appeal
   Don S. Samuelson, Counsel on Appeal


April 21, 2014                              /s/ Don S. Samuelson
Date                                       DON S. SAMUELSON
                                           *Counsel for Appellant*

i

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ...................................................................i

STATEMENT OF RELATED CASES ................................................ vii

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT .........................................................3

SUMMARY OF PROCEEDINGS BELOW ............................................4

   Englewood I – 61 Fed.Cl. 583 (2004). ...............................................4

   Englewood II – 79 Fed.Cl. 517 (2007). ..............................................4

   Englewood III – 84 Fed.Cl. 649 (2008)...............................................5

   Englewood IV – 86 Fed.Cl. 720 (2009) ..............................................6

   Englewood V – 94 Fed.Cl. 116 (2010). ..............................................7

   Englewood VI – 94 Fed.Cl. 614 (2011) ..............................................8

   Englewood VII – 479 F.App'x 969 212. .............................................8

   Englewood VIII – The Judgment Appealed From (2013)....................9

ISSUES ...................................................................................................10

STATEMENT OF CASE ........................................................................12

   In 1998 and 1999, South Pointe Was a Dangerous and Troubled Property. .......12

   A Four-Year HAP Contract was Critical:............................................14

   In December 2000, HUD Started its Efforts to Cancel the 2000 Contract: ........16

   Englewood Pursued Judicial and Administrative Appeals...................18

   Things Spun Out of Control for Englewood in the First Six Months of
   2002.....................................................................................................19

Englewood Had to Accept the Reilly Loan. ......................................................20

There Were Two Transactions. They Overlapped Slightly Because There
Were Operating Costs Involved in Both Transactions. ......................................27

SUMMARY OF ARGUMENT ...............................................................................28

ARGUMENT ..........................................................................................................32

STANDARD OF REVIEW ..................................................................................32

I.   ENGLEWOOD RETAINED THE OBLIGATION TO REPAY
     REILLY ADVANCES. ..................................................................................32

     A. The Reilly Loan Was a Separate Transaction from HUD's Breach
        of the 2000 HAP Contract. .......................................................................32

     B. Since Englewood Retained the Obligation to Repay Reilly
        Advances, Claims Related to Those Advances Should Not be
        Deducted from the Damages Award. ........................................................34

     C. Englewood's Legal Obligations Were Not Waived or Given Away,
        and did not "Fail to Come into Being."  HUD Simply Took Back
        Its Collateral. ............................................................................................39

     D. HUD Made a Bad Business Decision.........................................................41

     E. Englewood's evidence was adequate. .......................................................43

II.  HUD FELL SHORT OF SATISFYING THE ANALYTICAL
     STRUCTURE FOR DETERMINING SAVINGS SET OUT BY THE
     FEDERAL CIRCUIT. ...................................................................................44

     A. HUD's Insurance Endorsement was Conditioned on Englewood's
        Contribution of Funds to the Construction Loan Escrow Account..........44

     B. The Federal Circuit Explained the Analytical Structure by which
        the Claimed Savings Should be Determined.............................................46

     C. HUD's Individual Claims Do Not Meet the Analytical Structure
        Set up by the Federal Circuit.....................................................................49

     D. HUD Has Fallen Short in Meeting the Federal Circuit's Evaluation
        Criteria .......................................................................................................50

1. HUD could not use Reilly's Damages on Reilly's mortgage loan with Englewood as HUD Savings in its breach of contract award with Englewood. .................................................................51

2. Englewood paid $750,000.00 in cash into the CT&T construction escrow to pay for construction period real estate taxes and insurance. ...........................................................51

3. Payments on the principal on the CIC and Standard Federal loans were payments for capital assets not operating expenses. ..........52

4. Carl Sanders and John Hayes discussed the refinancing of the CIC loan with CIC and other lenders in 1999 and 2000. But the lenders needed the four year HAP contract. ........................................53

5. Englewood was financially viable until HUD destroyed it with the HAP Contract Breach. ...................................................56

III. ENGLEWOOD HAS IDENTIFIED CERTAIN OPERATIONAL EXPENSES NOT CITED BY HUD OR THE CLAIMS COURT WHICH ARE THE ONLY PROPER DEDUCTIONS, IF ANY, FROM THE DAMAGES AWARD. ...........................................60

IV. THE IMPLEMENTATION OF SOME FORM OF RENTAL INCREASE IS REQUIRED BY LAW AND CANNOT BE WAIVED OR DENIED BY BLAMING THE OWNER. .............................................62

CONCLUSION ..................................................................65

ADDENDUM

Judgment (Docket No. 285)..........................................................A1

Decision of the Court of Claims on Remand (*Englewood VIII*) (Docket No. 286) ......................................................................A2

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

iv

# <u>TABLE OF AUTHORITIES</u>

*Page(s)*

**Cases**

*Allianz Ins. Co. v. Lerner,*
  416 F.3d 109 (2d Cir. 2005)................................................................64

*Anchor Savings Bank FSB v. United States,*
  597 F.3d 1356 (Fed.Cir. 2010) ..........................................................33

*Belkin Int'l, Inc. v. Kappos,*
  696 F.3d 1379 (Fed.Cir. 2012) ..........................................................62

*Bell BCI Co. v. United States,*
  570 F.3d 1337 (Fed.Cir. 2009) ..........................................................32

*Bluebonnet Sav. Bank, F.S.B. v. United States,*
  339 F.3d 1341 (Fed.Cir. 2003) ..........................................................29

*Brighton Vill. Assocs. v. United States,*
  52 F.3d 1056 (Fed.Cir. 1995)..............................................................63

*e360 Insight, Inc. v. Spamhaus Project,*
  658 F.3d 637 (7th Cir. 2011) ..............................................................29

*Energy Capital Corp. v. United States,*
  302 F.3d 1314 (Fed.Cir. 2002) ..........................................................33

*Englewood Terrace Limited Partnership v. United States,*
  479 F. App'x 969 (Fed. Cir. 2012) ............................................... vii, 8

*Englewood Terrace Limited Partnership v. United States,*
  61 Fed. Cl. 583 (2004) ................................................................ vii, 4

*Englewood Terrace Limited Partnership v. United States,*
  79 Fed. Cl. 516 (2007) .......................................... vii, 4, 6, 8, 11, 62, 63

*Englewood Terrace Limited Partnership v. United States,*
  84 Fed. Cl. 649 (2008) .......................................................... vii, 5, 7

*Englewood Terrace Limited Partnership v. United States,*
  86 Fed. Cl. 720 (2009) .............................................................. vii, 6

*Englewood Terrace Limited Partnership v. United States*,
   94 Fed. Cl. 116 (2010), aff'd in part, rev'd in part and remanded,
   479 F. App'x 969 (Fed. Cir. 2012) ............................................................ vii, 7, 33

*Englewood Terrace Limited Partnership v. United States*,
   96 Fed. Cl. 614 (2011) ............................................................................... vii, 8

*Glendale Fed. Bank FSB v. United States*,
   239 F.3d 1374 (Fed.Cir. 2001) ...........................................................................33

*LaSalle Talman Bank. F.S.B v. United States*,
   72 F.3d 1363 (Fed.Cir. 2002)...............................................................................34

*Precision Pine & Timber, Inc. v. United States*,
   72 Fed.Cl. 460 (2006) .........................................................................................33

## Statutes

28 U.S.C. § 1295 .......................................................................................................3

28 U.S.C. § 1491 .......................................................................................................3

MAHRA § 221(d)(4) ................................................... 10, 16, 36, 44, 55

MAHRA § 524(c) ................................................... 5, 6, 8, 15, 62, 63, 64

MAHRA § 524(a) ....................................................................................................5

## Other Authorities

Pub. L. 106-74, § 531, 113 Stat. 1109, 1113 (1999) ...............................................62

## STATEMENT OF RELATED CASES

Counsel is aware of the following decisions in or from the same civil action or proceeding in the lower court or body that was previously before this or any other appellate court:

1. Englewood I - *Englewood Terrace Limited Partnership v. United States*, 61 Fed. Cl. 583 (2004)

2. Englewood II - *Englewood Terrace Limited Partnership v. United States*, 79 Fed. Cl. 516 (2007)

3. Englewood III - *Englewood Terrace Limited Partnership v. United States*, 84 Fed. Cl. 649 (2008)

4. Englewood IV - *Englewood Terrace Limited Partnership v. United States*, 86 Fed. Cl. 720 (2009)

5. Englewood V - *Englewood Terrace Limited Partnership v. United States*, 94 Fed. Cl. 116 (2010) aff'd in part, rev'd in part and remanded, 479 F. App'x 969 (Fed. Cir. 2012)

6. Englewood VI - *Englewood Terrace Limited Partnership v. United States*, 96 Fed. Cl. 614 (2011)

7. Englewood VII - *Englewood Terrace Limited Partnership v. United States*, 479 F. App'x 969 (Fed. Cir. 2012)

There are no cases known to counsel pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# INTRODUCTION

This appeal arises from the culmination of eleven years of litigation with its genesis in the Department of Housing and Urban Development's ("HUD") breach of a four-year HAP contract that ruined Plaintiff-Appellant Englewood Terrace Limited Partnership's ("Englewood") business and caused it to lose South Pointe. As detailed below, after eleven years of litigation and an initial award of over $3.2 million in damages, the district court erroneously determined that Englewood was entitled to nothing for the loss of its property.

This case consists of two separate transactions. The first involves HUD's breach of the 2000 HAP contract ("Contract") by canceling a four-year contract after only one year. HUD refused to renew a housing subsidy contract, consisting of an initial one-year term and three mandatory one-year renewals, violating its agreement to renew for the final three years. The second involves Englewood's default and Reilly Mortgage's foreclosure of its mortgage loan ("Loan") with Englewood. The loan was to rehabilitate South Pointe to a "like new building" standard. These were separate transactions.

HUD's counsel was emphatic in his final argument at trial that there was no connection between the HUD subsidy contract and the Reilly Loan:

> [t]here's been absolutely no evidence put forward that shows a relationship between a HUD insured loan…and the contract and the termination of the

contract…the loan and the HAP contract have not been connected by any testimony.  A1282-1283.

Englewood filed a breach of contract suit against HUD in September 2003. In November 2007, the Claims Court determined that HUD breached the 2000 HAP contract.  In July 2010, the Court awarded Englewood $3,272,017 in damages.  The Court denied Englewood's claim for annual rent increases provided for in the 2000 HAP contract and in the MAHRA statute governing HAP contracts as part of the damages.  Both parties appealed.

This Court determined that the Claims Court erred in its approach to damages.  The damages should have been based on "lost profits" not "lost revenue."  The Claims Court failed to deduct the expenses that Englewood would have been required to spend to generate the lost revenue:  "the Claims Court must reduce the damages award by any operational costs that Englewood did not pay but would have been obligated to pay if HUD had not breached the HAP contract." A breach of contracts damages award for "lost profits" must include the expenses required to generate the lost revenue.

## JURISDICTIONAL STATEMENT

The Claims Court had jurisdiction over this matter under 28 U.S.C. § 1491.

This Court has jurisdiction over this appeal from the final judgment of the Claims Court under 28 U.S.C. § 1295.

## SUMMARY OF PROCEEDINGS BELOW

On October 1, 2001, HUD breached the 2000 HAP contract with Englewood by failing to renew the contract for its second of four one-year terms. The court held in all of its opinions that HUD breached the HAP contract and Englewood was entitled to damages. There were eight opinions in this litigation.

### Englewood I – 61 Fed.Cl. 583 (2004).

HUD moved to dismiss Englewood's contract action for lack of jurisdiction. The court rejected the motion, saying that Englewood had alleged sufficient facts to establish that HUD breached its contractual obligation to renew each year for three additional years. A71. The court said: "The Government now has it exactly backwards: We are not presented with a circumstance in which HUD elected not to renew a contract, which had the effect of terminating it; rather HUD decided to terminate a contract that it was contractually bound to renew." A69.

### Englewood II – 79 Fed.Cl. 517 (2007).

A six-day trial was held on both liability and damages. HUD put on no case of its own. The Claims Court bifurcated the briefing on liability and on damages.

On November 30, 2007, the court found HUD liable for breach of contract, rejecting all of HUD's claimed defenses. A93-99, A119. The court determined that HUD should be held to the terms of the original HAP contract it made in October

4

2000.  A100.  The court did not define the nature or timing of HUD's breach of the 2000 HAP contract.

It also acknowledged that the HAP Contract contained a provision stating that: "After rent levels have initially been established under section 524(a) of MAHRA [Multifamily Assisted Housing Reform and Affordability Act], <u>all subsequent adjustment to Contract Rents shall be determined in accordance with section 524(c) of MAHRA.</u>  A121 (emphasis added).  The court continued that Section 524(c) provided, *inter alia*, that "the Secretary shall annually adjust the rents using an operating costs adjustment factor established by the Secretary (which shall not result in a negative adjustment) or, upon the request of the owner and subject to approval of the Secretary, on a budget basis."  A122.  The court expressly noted that: "[S]hall annually adjust the rents" is an imperative. It then analyzed case law holding that the annual adjustments were <u>required</u>.  A122-23.  The court ended its opinion by asking the parties to find a signed copy of the request for the budget-based rental increase.  A123.

**<u>Englewood III – 84 Fed.Cl. 649 (2008).</u>**

On November 25, 2008, the Claims Court said that neither party could find a signed of the budget based increase request. A128.  It therefore concluded that: "Because Mr. Hayes cannot demonstrate that he signed the request for the a rent increase and, independently, because, he subsequently agreed to the rents specified

in the 2000 HAP contract, Englewood's request claim based on a rent increase is denied." A133.

Despite its observations in Englewood II that MAHRA section 524(c) was imperative and required that an annual rental increase be made by HUD, the court did not consider HUD's obligation under MAHRA Section 524(c) to provide some annual rent adjustment based on either: (1) the application the Operating Cost Adjustment Factor ("OCAF") (which required no owner action), or (2) a budget based request (which required an owner submission and approval by HUD). The court acknowledged in Englewood IV that MAHRA statute only required that a budget based rental increase be submitted by the owner. "The language of the MAHRA itself does not appear to require an OCAF rent increase." A154.

### Englewood IV – 86 Fed.Cl. 720 (2009).

Englewood timely filed a motion for reconsideration. Document 164. Englewood argued that Section 524(c) of MAHRA (A121) required as a matter of law that there be some form of annual rental increase (A122), and the MAHRA legislation did not require an owner request for the OCAF. A154. Englewood calculated that the increases under OCAF would have been $612,134.00 over the four years, rather than $611,484.00 under the budget-based request. A149.

On April 7, 2009, the court denied Englewood's motion for reconsideration. A147. The court acknowledged that the language in MAHRA does not require an

OCAF rent increase request. A154. Despite Englewood's persistent challenges, there never has been a determination on the merits as to whether the failure to implement an annual rental required by MAHRA was an error of law.

### **Englewood V – 94 Fed.Cl. 116 (2010)**.

In Englewood V, the court determined that there was a breach, although "the date of the breach is not exactly straightforward", that it was foreseeable that it [HUD's breach] would cause "lost revenue" damages, that the HUD breach caused Englewood's losses, that Englewood properly mitigated its damages , and that the damages were set forth with reasonable certainty. A163-67. The court concluded that Englewood could recover damages for HUD's breach. A171. However, the court concluded that lost equity was a consequential damage that was too uncertain and remote to be considered arising out of HUD"s default of the HAP contract. A172-73.

The court said that, since it had already decided against Englewood's claim for the annual rental increase in *Englewood* III and IV, it was not being discussed in *Englewood* V. A.158.

The Claims Court calculated damages as the difference between the rental income that Englewood would have received had the HAP contract not been breached and the rental income it actually received. A171. However, the court decided that: (1) damages could only be recovered from July 1, 2002, not October

1, 2001, through the end of the contract on September 30, 2004; (2) that the occupancy should be 97% for the first five months (until the Reilly mortgage in December 2002) and then 90.5% for the remainder of the contract in September 2004. *Id*. Accordingly, the court reduced Englewood damages for lost revenue by $1,073,663 from $4,345,880 to $3,272,217. A177.

### Englewood VI – 94 Fed.Cl. 614 (2011).

Englewood filed a motion for reconsideration on September 3, 2011, arguing that Section 524(c) of MAHRA was mandatory and that it required at least an OCAF increase, a requirement of MAHRA that the court discussed at length in in *Englewood II*. A121. The court denied the motion, stating: "The current request to reconsider the matter is the second request submitted by plaintiff for reconsideration of damages based on its claim of entitlement to an OCAF rent increase." A192.

### Englewood VII – 479 F.App'x 969 212.

On appeal, this Court determined that the lower court had miscalculated the damages. A204. This Court also summarized the principles to be followed in breach of contract cases. A205-06.

This Court reversed and remanded for a recalculation of damages. A207. The Claims Court was directed "to reduce the award by any operational costs or expenses Englewood did not pay but would have been obligated to pay if HUD had

not breached the HAP contract." A205-06.  It added that "if Englewood retained

the obligation to repay these expenses they would not need to be deducted."  *Id.*

**Englewood VIII – The Judgment Appealed From (2013).**

The Claims Court held in its remand decision that Englewood failed to prove

the necessary damages, or that it had paid any of the savings claimed by HUD.

The $3,272,217 in damages was reduced to zero. A29.

Englewood accepted the eight expense categories HUD alleged Englewood

did not pay: (1) the CIC principal and interest - $1,743,292.49, (2) the principal

and interest on the Standard Federal loan - $765,237.56, (3) major rehabilitation

repairs , (4) operational expenses, (5) real estate taxes – $500,195.99, (6) property

insurance - $241,661.03, (7) construction period interest - $618,232, and (8) post

construction interest - $430,769.08.  The total deductions from savings approved

by the court were $4,299,388.15. A23.  The court agreed with HUD that

Englewood did not pay **ANY** of the expenses, and that Reilly or IHDA paid them

all.  A25.

HUD claimed that, since Reilly and IHDA executed the loans as non-

recourse loans, Englewood had no obligation to repay either loan.  A23.

HUD and IHDA did not require them to be personally guaranteed, only that they

be collateralized.  The collateral consisted of the South Pointe building and

improvements, and $1,340,906 in payments for the HUD insurance: $750,000.00

in the IHDA loan to Englewood which was deposited in the CT&T escrow account; $474.906 in the payables fund, and $116,000.00 as a Good Faith Deposit. A990, A1058.

The Claims Court directed the parties to identify credible documents in the record showing that Englewood *paid* any of the expenses claimed by HUD to be savings, and therefore deductions from the damages award. Finding none, it deducted all of the claimed deductions by HUD and reduced the damages award to zero. A29.

## ISSUES

1.      Englewood was obligated under the Note and Mortgage to repay all of the advances made by Reilly on the 221(d)(4) HUD insured loan. Did the court err in not recognizing legal commitments as it considered the mandate from the Federal Circuit that, if Englewood retained legal obligations to repay expenses, they should not be deducted from the damages award?

2.      Englewood paid the operational expenses it was obligated to pay between October 1, 2001 and September 30, 2004. Did the Claims Court err in deducting: (a) the principal payments on the CIC and Standard Federal loans; (b) the real estate taxes and insurance that were funded in the CT&T escrow account by Englewood; (c) Englewood disbursements for operations documented in PX 1

10

3, PX 15 and PX 17; and (d) construction and post-construction interest payments on the Reilly loan?

3.     There were some operational expenses that Englewood did not pay resulting from the HUD breach of the 2000 HAP contract. They involved: (a) interest payments on the CIC and Standard Federal loans; (b) the 2004 property insurance premium; (c) the first installment of real estate taxes in 2004; (d) and a limited number of operational expenses in 2004. Did the Claims Court err in finding that there were any other operational costs that Englewood had an obligation to pay but did not pay because of HUD's breach of the 2000 HAP contract?

4.     Englewood challenged the Claims Court's denial of the annual rental increase, which the court had previously recognized in *Englewood II* was required by statute.  Did the Claims Court err in not allowing Englewood to challenge this ruling as a matter of law?

These questions should all be answered in the affirmative.

## STATEMENT OF CASE

## In 1998 and 1999, South Pointe Was a Dangerous and Troubled Property.

In 1998, South Pointe was a 22-story high rise in the very distressed Englewood neighborhood on the South Side of Chicago. A596 There was an active drug trade in the building and neighborhood, and the costs of tenant damage and evictions were extremely expensive. A602.

Englewood submitted a very detailed request for a rental increase on May 18, 1999. A590,A784-803. In response, HUD's management consultant, the Pinnacle Realty Management Company, conducted a comprehensive evaluation of the property and submitted its report to HUD on August 10, 1999. A592-602. The neighborhood was described as distressed, dangerous, and controlled by gangs. A596. The eviction process generated death threats to onsite staff. *Id*. Other than normal work orders and janitorial needs, the main physical problem related to the boilers and elevators needing significant repairs or replacement. A598. Pinnacle found the units spacious, with adequate demand and a ready pool of Section 8 residents in the area. A600. There was a need for armed off-duty police for security. A602. The costs of evictions and unit turnover was "blowing out the budget." *Id.*

South Pointe was subsidized by a Housing Assistance Payment contract ("HAP"). A536-539. The contract contained provisions restricting the tenancy to

12

low-income families. A540. The units could be leased with a subsidy when they became vacant. A539-40. HUD would pay the owner 80% of the rent for two months for vacant apartments. A537. Rents could be increased by 5% with the approval of budget-based requests. A539. There were provisions requiring Englewood to make physical improvements. A544-45. Amendments to the contract had to in writing and signed by the owner and HUD. A546. It was renewed in 1999. A550-554.

Englewood met with CIC and other lenders in 1999 concerning the refinancing of the CIC loan. A1203,A1216,A1220-21,A1222-24,A1227-28. On August 18, 1999, John Hayes, Englewood's general partner, wrote to Joan Kiening at HUD to brief her on the status of Englewood's efforts to restructure the CIC debt. A603. Carl Sanders wrote to Kiening on September 2, 1999 that there was positive feedback on the restructuring with Al Zelitsky and it was "highly probable" that the loan request would be approved. A605. However "It would not be feasible for them to loan us the funds…if we will not receive a contract." A605-06.

Senior Washington officials visited South Pointe on August 30, 1999 and indicated they were "pleased to see the benefits of the increased security program, the potential of the resident services program and the promises of the ongoing rehabilitation work." A607-08. HUD rejected Englewood's request for a rental

increase. A609. It also rejected Englewood's request for a supplemental HUD 221(4) loan. A611. Therefore, Englewood was forced to invest more than $700,000.00 of its own funds to finance the REAC correction work. A776. Englewood's physical improvement plan was approved by The Department Enforcement Center ("DEC) and HUD Multifamily in its Final Team Report in January 2000. A613-22. It reflected a $770,000.00 contribution by Englewood for repairs and operation. A613. Because of Englewood's progress in correcting problems at South Pointe, and its $770,000.00 investment, South Pointe was returned from the DEC to HUD Multifamily Housing supervision. A620.

**A Four-Year HAP Contract was Critical:**

Both Sanders and Hayes testified at trial concerning their negotiations with CIC and other lenders about Englewood's need to refinance the CIC debt and the need for a four-year HAP contract. A1221-24,A1228. A four-year HAP contract was "the only way we could get a lender's attention." A603,A605.

Englewood applied for a four-year HAP contract in July 2000. HUD approved the 2000 HAP contract effective October 1, 2000. A555-563. It provided a four-year contract with an initial one-year term, - through October 1, 2001 - that would be _automatically_ renewed for three successive one terms – through September 30, 2004. A555. Hayes believed a four-year HAP contract would enable him to get the attention of lenders to refinance South Pointe. A1228.

14

The 2000 HAP contract was designed to renew the 1998 HAP contracts with all the contract benefits provided in the 1998 HAP contract, (A555) with all of the HAP program benefits - vacancy payments, the right to re-lease vacant apartments, annual rental increases, etc. - with the addition of three automatic one-year renewals. *Id.*

The 2000 HAP contract had two significant changes. The first was the inclusion of annual rental increases based on an annual Operating Cost Adjustment Factor (OCAF) required by section 524(c) of the Multifamily Assisted Housing Reform Act (MAHRA), set by the HUD Secretary, based on year end cost-of-living data or a budget-based request submitted by the owner. A556. Section 524(c) of MAHRA provided that the mandatory annual increases in rents were to be made by either by an OCAF adjustment or by a budget-based request by the owner. *Id.*

At trial, Englewood's damages calculations were based on an OCAF rent increase. A166. However, it produced no exhibit showing a rental increase was approved. A166-67. The court felt that Englewood had produced a framework from which other damage calculations could be made. *Id.*

The second change was the incorporation of a REAC inspection report as the method for determining physical defects and the need for correction. A558. MAHRA was the legislative mandate providing for HUD to create standardized

physical improvement plans and predictable rental increases to cover increased costs of operations. A121-23. HUD accepted Englewood's physical corrections on October 3, 2000. A656.

To process its 221(d)(4) loan application, HUD directed Englewood to complete a 100% unit inspection of South Pointe to determine needed repairs. Englewood completed its 100% unit inspection on November 3, 2000. A657-665. In November 2000, Englewood was on track with a possible 221(d)(4) refinancing with HUD and a four-year HAP contract that could support a refinancing with a lender.

**In December 2000, HUD Started its Efforts to Cancel the 2000 Contract:**

The possible re-financings were short lived. On December 6, 2000, HUD claimed that the contract had been made in error and it was amending and physically altering the 2000 HAP agreement. A667. HUD repudiated its commitment to make automatic renewals. *Id.* HUD physically altered the contract from one year with three one-year automatic one-year renewals to a three-month contract with no renewals and different termination dates. A564-68. The contract would be terminated on December 31, 2000. A570. Most important to Englewood, it was only a three-month contract. Englewood could not tell lenders that it had a multi-year HAP contract.

16

A month later, HUD made another amendment, re-establishing the original one-year term. A571,A575.  In effect, Englewood was left with a one-year HAP contract ending on September 30, 2001.

HUD piled on.  On March 8, 2001 HUD completed the 2001 REAC inspection.  A578-589.  Englewood filed its response on April 5, 2001. A670-678. On April 9, 2001, without reading the Englewood report, HUD declared Englewood in default.  A679-80.  With its repudiation of its renewal obligations and its Notice of Default, HUD relied on the default provisions in the REAC amendment to the 2000 HAP contract to terminate the 2000 HAP contract on October 1, 2001, abate HAP payments, and issue vouchers.  A574.  Later, the court determined that HUD's actions were invalid and not supported by the record. A119.  Nevertheless, HUD marched forward.

HUD declared Englewood in default, ordered the vouchers, arranged for their administration on June 10, 2001, and then had informational meetings with residents in August.   A679-80,A737.  HUD ordered vouchers to be ready on September 30, 2001 so that they could be issued on October 1, 2001. *Id*.   HUD created a 90-day subsidy extension to continue the HAP subsidy until the end of the year and the South Pointe residents would have time to obtain and implement their housing vouchers.

To HUD, it was logical to explain to residents in August of 2001 that they would have vouchers and they could start the eligibility determination process. A737. Hinsberger sent two emails to Hayes on October 1, 2001 stating that CHAC was prepared to issue vouchers and then to follow up with the message that the vouchers "were being issued." A699-700,A89. Therefore, HUD breached the 2000 HAP contract by failing to honor the automatic renewal provision in the 2000 HAP contract.

**Englewood Pursued Judicial and Administrative Appeals.**

Englewood attempted to persuade HUD that it was breaching the HAP contract, but HUD believed it had the discretion not to renew the contract and that its decision was not subject to judicial review. A68. So negotiations went nowhere, and CHAC continued to issue vouchers. By March 8, 2002, Hinsberger wrote that "almost all of them had been issued. A737

On October 29, 2001, Englewood filed for an injunction in the Northern District of Illinois to mandate the renewal of the 2000 HAP contract and to stop the issuance of vouchers. A89. The district court denied the injunction request and directed HUD to "continue" the issuance of vouchers. A90.

The court found that: "At the time of the breach, the HAP payments made up more than 88% of Englewood's revenue at South Pointe." A163. Because so few residents had actually left South Pointe by the end of 2001, and less than one-third

18

had their vouchers, HUD decided to extend the HAP subsidy for another 180 days – through June 30, 2002.   The court found that the loss of the HAP contract "caused" Englewood to lose a significant amount of revenue.  A165.  The amount of revenue the HAP breach caused Englewood to lose was $3,272,217.

**Things Spun Out of Control for Englewood in the First Six Months of 2002.**

First, occupancy dropped from 97% in December 2001 to 65% in May, and to 35% in October.  A159.  The court found that this result was foreseeable.  A163.  Englewood also ran up large deficits doing unit trashing, cleaning, and repair to make the units available to South Pointe residents with vouchers.   Thus, HUD's breach caused Englewood to lose the payments guaranteed by the contract.  A165.

Second, on May 2, 2002, CIC filed foreclosure action against Englewood.  A1148-A1155.  Earlier, as part of the final administrative appeal within HUD, Hinsberger wrote to HUD Washington on March 8, 2002 that "almost all" of the vouchers had been issued.  A737.

Third, Englewood's cash flow was severely compromised when HUD did not pay Englewood its April HAP payment for $156,391.00, until May 9, 2002.  By May 9, 2002 Englewood had $317,161.00 in HAP payments – for April and for May - but, because of HUD's delays, it did not have the cash to pay its CIC mortgage payment on May 1, 2002.   Englewood was only$55.332.00 in arrears, easily payable by the $317,161.00 in HAP payments HUD owed for April and

May.  The larger problem, of course was that, from May through August 2002, occupancy was in a free fall to the 35% occupancy in September   A159.

Fifth, South Pointe continued to pay all of its operating costs These payments were documented in the general ledger: see the expenditures made in 2002-  A973-88.  Compare to the sample of the general ledger which the court chose to illustrate the inadequacy of the general ledger.  A26-27

All of the bills required to continue the operation of South Pointe – utilities, security, administrative/maintenance/janitorial payroll, elevators, taxes and insurance – were paid.  A973-88,A997-1014,A1016-24.  The general ledger entries for all of the South Pointe revenue collections and expense payments were documented – chronologically by day – in PX 13. A973-A989,A990;PX 15,A997-A1014;PX 17,A1016-A1024,A1192.[1] The total for the expenditures documented in the general ledger were $5,448,146: 2002 - $2,317,853; 2003 - $2,148,459; and 2004 - $981,834.

**Englewood Had to Accept the Reilly Loan.**

On May 3, 2002, HUD offered Englewood a Commitment for Mortgage Insurance that would provide a refinancing without requiring a HAP contract revenue stream.  A1134-36.  It was conditioned on the funding of deposits of

---

[1] There was testimony at the trial that the general ledger was the customary way in which Englewood recorded receipts and disbursements. They were done on a daily basis.  Copies of the records were made in 2006 for distribution and use at trial. They were not entered at that time. They were merely copied.

$232,966.00 and $458,850.00 as well as $58,241.00 for a mortgage insurance premium. The funding of a good faith deposit of $116,483.00 and the creation of a working capital fund of $474,906.20 were added as "additional conditions." A1136.

Although onerous, this transaction was the only alternative to the prosecution of the foreclosure by CIC. The first step in the process was the issuance of the Conditional Commitment from HUD to Englewood on May 3, 2002. A1134-36. CIC agreed to defer the further processing of its foreclosure action on the condition that Englewood would go forward with the Reilly loan of $11,648,300.00. Englewood issued a HUD -approved Assignment of the Firm Commitment to Reilly on December 12, 2002. A1089-90. The Reilly loan would provide excess mortgage proceeds or cash available to the owner to enable Englewood to pay off the CIC loan. A1057.

Englewood filed a loan application with the Illinois Housing Development Authority ("IHDA") for $750,000.00 to pay for its funding obligations required by the Reilly Loan. A1158-63. IHDA provided a Commitment to Englewood to provide a $750,000.00 loan to be used in conjunction with the Reilly loan and the borrower's equity of $1,416,700.00 which "shall be comprised entirely of the value of the real estate, which is the net of the outstanding mortgage balance." A1159.

On December 2, 2002, Reilly found an investor who would fund the loan. (8698-8699). On December 6, 2002, Englewood had a loan Commitment from Reilly for $11,648,300,00, an investor willing to purchase the Reilly mortgage, a $750,000.00 loan from IHDA, and $1,416,700.00 as the equity value of its interest in South Point. A1134-36,A1156-63.

The Financial Requirements for Closing consisted of Cash Required for Construction of $7,083,955.00, Carrying Charges and Financing of $1,360,685.00, legal expenses of $101,687.00, and a Contingency of $644,071.00, totaling $9,190,398.00. A1056-57. The difference between the total construction costs and the loan was "Cash Available to Mortgagor" of $2,457,902.00 to pay off the CIC and Standard Federal loans. *Id*. The Carrying Charges included $618,272.00 in capitalized interest during construction, $250,000.00 for taxes during construction $120,000.00 for insurance during construction, and $116,483.00 for the HUD mortgage insurance premium. *Id*.

The Amended and Restated Trust Agreement provided that CT&T could execute and deliver agreements and take such other actions as directed in writing by Englewood as the beneficial owner of the Trust. A1141.

The mechanics are spelled out in the Construction Loan Escrow Disbursing Agreement. A1103-09. Lawyer's Title Insurance Corporation ("LTIC") is the

Escrowee.  A1104. The agreement provides that "LTIC has been asked to provide

disbursing services to pay for construction and other developmental costs." A1105.

> At the request of the Owner/Borrower, lender will make periodic deposits
> into the escrow to be disbursed by the escrowee in accordance with this
> agreement as hereinafter set forth.  Owner/Borrower may deposit or cause to
> be deposited funds not a part of the mortgage proceeds into this escrow
> which these funds will also be disbursed by the Escrowee under the
> provisions of this agreement. *Id*.

Prior to any disbursement by the Escrowee, the Owner/Borrower shall furnish to

the Escrowee an Owner's Sworn Statement containing written approval by the

Owner/Borrower the payment of the construction draw. A1105.

The Escrow Agreement Additional Contribution by Sponsors provides that a

Commitment to insure, necessary to the project, and the Commitment is

conditioned on the assurance of additional funds being made available for the

project.  A1103-09.  This references Englewood's deposit of $458,850.00.  A1137.

The Mortgagee's Certificate confirmed that Englewood paid Reilly $58,241.00 for

the mortgage insurance premium, $232,966.00 in cash for working capital, and

provided an escrow agreement evidencing a deposit in cash of $458,850.00 for an

initial operating deficits. (A1071-72). The total of the funds provided by

Englewood (from its IHDA loan) to Reilly were approximately $750,000.00. These

were deposited by Englewood into the escrow account.

A Building Loan agreement was executed between CT&T, Englewood, and Reilly. A1060-65. It provided that the Englewood should complete the construction of the building consistent with plans and specs by February 12, 2004. A1060-65. It also provided for the priority distribution of funds from government entities for taxes ($250,000.00), insurance ($120,000.00) and the cash available to the mortgagor ($2,457,902.00). A1061.

In the first draw, the Loan closing statement documented the Sworn Owner's Statement of Sources and Uses of Funds. A1058. The "sources" of funds were the IHDA Loan Proceeds, the owner's Good Faith Deposit of $116,483.00, and the draw proceeds of $3,125,694.00. A1058. The draw proceeds included Excess Mortgage Proceeds of $2,457,902.00. A1059. Englewood provided $3,324,385.00 of the sources of the first draw. ($750,000.00, $116,483.00 and $2,457,902.00).

The "uses" reflected in the loan closing statement reflected payments for the mortgage insurance premium ($58,241.00), insurance ($154,579.00), the operating deficit account ($458,850.00), the working capital fund ($232,966.00), the payoff of the CIC loan ($1,743,293.00) and the payoff of the Standard Federal loan ($765,237.00). A1058. These uses amounted to $3,413,166.00. A1058. The Sworn Owner's Statement indicated that the $250,000.00 to provide for draws for real estate taxes would be a "balance to become due," along with construction

24

interest, the second mortgage insurance premium, contingency and the audit. A1066.

The Note set out the provisions for accelerating the debt upon default, and the legal requirements for repayment. A1076-77. The Mortgage incorporated all of terms of the Note and secured payment and the performance of all of the covenants and agreements. A1078-83. The Mortgage provided in Section 11 that: "the Mortgagee may pay such taxes, assessments and insurance premiums…and make necessary repairs…and any sums expended by the Mortgagee…shall be so much additional indebtedness, secured by this mortgage to be paid out of the proceeds of the sale of the mortgagee premises. A1079. Section 16 contains similar conditions related to construction related expenses. A1080.

All of the Applications of the Insurance of Advances of Mortgage Proceeds required Englewood to certify that "We hereby authorize you to advance same and charge our account therewith" (Draw #1, 4575; Draw #5, real estate taxes, A1110-13; Draw #9, real estate taxes, A1114-18; Draw #12, A1119-21; and Draw #18, change order, A1122-25.

Reilly's requests to draw funds from the initial operating deficit fund can be found in: A1091-96. Reilly's approval of Englewood's requests for funds from the working capital fund can be found in: A1097-A1102.

On February 26, 2004, Reilly wrote that it had advanced $216,790.00 outside of the mortgage: $129,628.00 for real estate taxes and $87,082.00 to pay the balance of the 2004 insurance premium. A1164. On May 26, 2004, Reilly wrote that the loan was in default and Reilly was going to assign it to HUD. A1165.

Reilly assigned the Note and the Mortgage to HUD on July 25, 2007. A1166-67. The district court granted Mortgagee in Possession status on October 13, 2005. A1177-80. The attachment to the order indicated that, out of 33 properties sold at public auction, South Pointe did the worst, with a payment of $2,300,539 for a note value of $11,648,300. A1182.

On October 17, 2005, the Cook County Circuit Court approved the final report, discharged the Receiver, and dismissed the action. A1183-87. The court found that: HUD elected to enforce its rights under the mortgage and under the National Housing Act in the district court action A1185.

Mary Anderson filed an Affidavit in the district court summarizing events from the inception of the Reilly loan in December 2002. A1188-91. She summarized the structure of the loan relationship:

> Reilly Mortgage Group ("Reilly") was the mortgagee, the mortgagor was the Trustee, although pursuant to their Trust Agreement, Englewood was responsible for making payments due under the Mortgage Note and Mortgage. A copy of the Amended and Restated Trust Agreement is attached to this Affidavit. A1189.

26

In May 2004, Reilly declared the mortgage in default and accelerate the debt. A1190. In July 2004, it filed for foreclosure and the appointment of a receiver. *Id*. On July 27, 2005, Reilly contacted HUD and indicated that the mortgage had been assigned and recorded. *Id*. On September 26, 2005, HUD received a fax from Walker & Company that contained a breakdown of the claims submitted by Reilly for sums advanced by Reilly. A1192.

**There Were Two Transactions. They Overlapped Slightly Because There Were Operating Costs Involved in Both Transactions.**

There were two separate transactions involved in this litigation. In the first transaction, HUD had agreed to provide four-years of HAP contract subsidy to Englewood. Both this Court and the Claims Court agreed that HUD breached the HAP contract and was liable for damages. A3. They also agreed that Englewood lost $3,272,017 in revenues because of HUD's breach. A177. This Court confirmed that Englewood was entitled to "lost profits," A203, but determined that "lost profits" required documentation of the expenses that Englewood would have needed to pay to generate the HAP contract revenue.

In the second transaction, which HUD concedes is separate, Englewood borrowed funds from Reilly mortgage in a HUD-insured loan to build the "like new" building that Hinsberger felt could compete in the Englewood marketplace without a HAP subsidy. A857-59. The actual experiences of both Englewood and

the receiver demonstrated that could not be done.  *Id*.  Englewood defaulted on the HUD-insured Reilly loan and remained liable for damages through the end of the HAP contract period until the loan was assigned by Reilly to HUD, and HUD elected to foreclose on the property.  A1185.  Amazingly, HUD decided to sell the property for $2,300,539.25 at a public auction, essentially the value of Englewood's equity in South Pointe before the loan, with HUD losing the $9.3 million balance in the mortgage.  A1182.

The question is: what, if any, of the payments made with Reilly loan funds would have been payments that Englewood would have had to make if HUD had not breached the HAP contract and Englewood had to incur those costs to operate South Pointe?

## SUMMARY OF ARGUMENT

This Court set out the general principles to be used in calculating breach of contract damages.  It also gave specific instructions on how they were to be implemented.  Englewood's contends that the Claims Court erred in applying this Court's mandate to the facts.

This Court explained that the "Claims Court erred by failing to deduct costs and expenses Englewood saved, i.e., did not pay, as a result of the breach." A204.  "By failing to deduct avoided costs, the Claims Court placed Englewood in a better

position than it would have been in had there been no breach." *Id*. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1345 (Fed.Cir. 2003).

This Court cited *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 647 (7th Cir. 2011) for the principle "that where a plaintiff saved certain expenses as the result of the breach of a contract, lost revenue alone is not an appropriate measure of damages…[G]ross revenue is generally not an appropriate measure of damages because revenue is calculated without regard to the costs the plaintiff incurred in the course of making that revenue." A205-06. So the Claims Court erred in failing to include expenses "saved" in its calculation of lost profits.

This Court then described how the damages award should be reduced by the Claims Court.

> The Claims Court must reduce the award by any operational costs or expenses Englewood did not pay but would have been obligated to pay if HUD had not breached the HAP contract.[2] These may include mortgage payments, liability insurance, property taxes and money for repairs and rehabilitation of South Pointe. We make no determination as to which of these items should be deducted, leaving that determination to the Claims Court in the first instance.

> > [2.] As HUD concedes, if Englewood retained legal obligations to repay these expenses they would not need to be deducted. *See* Cross-Appellant's Reply Br. 19. But HUD contends that it already largely paid these costs itself.

A206-07.

First, whether or not Englewood (or Reilly) paid operational expenses necessary for the production of HAP contract revenue, Englewood retained the

legal obligation to repay (Reilly) these expenses, so they should not be deducted.
Reilly loan advances were used to pay claimed savings. Englewood had the legal
obligation to repay Reilly advances. Therefore, none of those expenses should be
deducted.

Second, the claimed savings had to be: (1) an obligation of Englewood; (2)
an operational expense directly related to Englewood's production of rental
revenue; (3) an expense that Englewood did not pay; and (4) an expense related to
or caused by HUD's breach of the HAP contract. All four of these criteria had to
be met to qualify as a "saved" expense properly deducted from the damages award.
HUD did not meet these criteria in its claimed deductions from the damages award.

The claims for the principal on the CIC and Standard Federal loans are
claims for assets, not expenses. Englewood did not have any legal responsibility
for major repairs under the HAP Contract, but only for keeping Englewood
"decent, safe and sanitary." Englewood did not have any responsibility for the
construction period or post-construction period interest on the Reilly loan. The
$750,000.00 that Englewood paid as a condition of the Reilly loan was used to pay
construction-period real estate taxes and insurance. Finally, Englewood paid more
than $5,000,000.00 in operating expenses in 2002-2004.

There are only five categories of expenses that were also advances by Reilly
which were not covered by the loan and also meet the reduction criteria this Court

established: (1) one-half of the 2004 property insurance premium funded by a Reilly advance; (2) the first installment on 2004 taxes; (3) specific advances for gas and payroll in the first five months of 2004; (4) advances for operations from June through September 2004; and (5) the interest costs of the CIC and Standard Federal loans.

Finally, it was legal error for the Claims Court to deny Englewood the annual rental increases that were provided for in the 2000 HAP contract and required by the MAHRA statute. Accordingly, the judgment appealed from should be reversed, and the matter remanded for a proper calculation of damages, including damages for the increased rents over the period of the breach.

# ARGUMENT

## STANDARD OF REVIEW

This Court reviews the Claims Court's findings of fact under the clearly erroneous standard, and its legal holdings *de novo*. *Bell BCI Co. v. United States*, 570 F.3d 1337, 1340 (Fed.Cir. 2009).

## I. ENGLEWOOD RETAINED THE OBLIGATION TO REPAY REILLY ADVANCES.

### A. The Reilly Loan Was a Separate Transaction from HUD's Breach of the 2000 HAP Contract.

There were two separate transactions involved in this litigation. HUD had a contract relationship with Englewood to provide four years of HAP subsidy to South Pointe. HUD breached and was found liable for $3,272,017.00 in damages. Englewood had a mortgage loan relationship with Reilly to fund the substantial rehabilitation of South Pointe to a "like new building" standard. Englewood defaulted on the Reilly loan (because of HUD's earlier misconduct in breaching the HAP contract) and it was foreclosed. HUD insured the Reilly loan. But the contract and loan were different transactions between Englewood and HUD (the contract) and Englewood and Reilly (the loan). HUD's counsel in his closing argument said with considerable passion:

> [t]here's been absolutely no evidence to put forward that shows a relationship between a HUD insured loan that Englewood inked three weeks after the HAP Contract ended, and the contract, and the termination of the contract. Did the loan fail for bad planning, wrong

> projections, wrong financial projection, something else?  It doesn't
> make any difference for this suit (the Englewood breach of contract
> suit against HUD) because the loan and HAP Contract have not been
> connected in any way.  A1282-1283.

The Claims Court said in *Englewood V* that taking out the $11.6 million loan

did not put Englewood in a better position that it would have been with the

continuation of the HAP contract. A169.   It continued: "It, therefore, is possible

that the payments made directly to the HUD-insured Reilly Mortgage loan, such as

the interest on the Reilly Mortgage loan itself, should not be deducted from

plaintiff's damages award." A20.

Earlier in its remand decision , the Claims Court cited *Anchor Savings Bank*

*FSB v. United States*, 597 F.3d 1356, 1361 (Fed.Cir. 2010).

> Damages for breach of contract are designed to make the none-breaching
> party whole.  One way to accomplish that is to award "expectancy
> damages," i.e., the benefits the non-breaching party would have expected to
> receive had the breach no occurred.  *Glendale Fed. Bank FSB v. United*
> *States*, 239 F.3d 1374, 1380 (Fed.Cir. 2001). Expectancy damages "are often
> equated with lost profits, although they can include other damage elements
> as well." A16.

It then discussed *Precision Pine & Timber, Inc. v. United States*, 72 Fed.Cl. 460,

471 (2006) *quoting Energy Capital Corp. v. United States*, 302 F.3d 1314, 1328

(Fed.Cir. 2002) to say: "In order for lost profits to be recoverable, 'they must flow

from the contract that is the subject of the lawsuit and not from independent and

collateral undertakings.'"  A16.

The Claims Court went on:

> Similarly, when considering when a plaintiff saved, or did not pay, as a result of the breach, the savings, as a form of offset, should be 'limited to actions reasonably directly related to the breach and its proximate consequences. *LaSalle Talman Bank. F.S.B v. United States*, 72 F.3d 1363, 1366 (Fed.Cir. 2002)

A16-17.

This Court described the method whereby an appropriate reduction should be made in the damages award by the Claims Court.

> The Claims Court must reduce the award by any operational costs or expenses Englewood did not pay but would have been obligated to pay if HUD had not breached the HAP contract[2] …

> > [2] As HUD concedes, if Englewood retained legal obligations to repay these expenses they would not need to be deducted. *See* Cross-Appellant's Reply Br. 19. But HUD contends that it already largely paid these costs itself.

Did Englewood retain the legal obligations to repay Reilly advances?

Unless they did not, HUD would have failed the threshold test for claiming deductions against the damages award. As detailed below, Englewood did in fact retain legal obligations to repay the erroneously awarded reductions. Accordingly, the judgment appealed from should be reversed.

**B.  Since Englewood Retained the Obligation to Repay Reilly Advances, Claims Related to Those Advances Should Not be Deducted from the Damages Award.**

This Court explained the conditional nature of HUD claims for reductions in the damages award: "As HUD concedes, if Englewood retained legal obligations to

repay these expenses, they would not need to be deducted." A206. Englewood retained the legal obligation to repay the entire loan proceeds disbursed on its behalf by Reilly. They are set out in the various documents executed in anticipation of or as part of the loan closing.

Englewood signed a Note, secured by a Mortgage, to repay the $11,648,200.00 loan from Reilly. A1076-77. Englewood was responsible for the repayment of the loan funds for the substantial rehabilitation of South Pointe into a "like new building." Reilly foreclosed on the mortgage, taking back and selling the property, when Englewood was unable to pay its obligations. Because of the foreclosure, Englewood lost South Pointe, its $7,000,000.00 in construction improvements, and over $1.5 million in partnership advances. ($750,000 in deposits to the escrow fund-A1071-72; $474,906 to fund the accounts payable fund on December 26, 2002-A990; $50,000 to cover payroll on April 30, 2002-A978, $20,000 for a cash advance on October 30, 2002-A986, $16,000 for a cash advance on November 26, 2002-A987, $28,000 for a cash advance on December 12, 2002-A988, $25,000 for a cash advance on April 28, 2003-A1003, $9,000 for a cash advance on July 17, 2003-A1008, $25,000 for a cash advance on September 18, 2003-A1011). The land, the building, and the substantial rehabilitation improvements were the collateral for the Reilly loan.

The Note provided that the Mortgagor Reilly loan was CT&T, as Trustee under a Trust Agreement dated February 13, 1992 and known as Trust No 1096211. Englewood owned the beneficial interest. Englewood directed CT&T as to when and how to make payments. Englewood was responsible for repayment of funds borrowed from Reilly. A1076-77. All of the payments made through the Trust depended upon Englewood's written instructions.

The Mortgage provides in Section 11 that, in situations where the mortgagor fails to make payments required for the operation of the property, "the Mortgagee may pay such taxes, assessments and insurance premiums…and make necessary repairs…and any sums expended by the Mortgagee…shall be so much additional indebtedness, secured by this mortgage to be paid out of the proceeds of the sale of the mortgagee premises." A1079. Section 16 contains similar conditions concerning construction related expenses. A1080. To the extent that additional funds were necessary for the construction and operation of the building, they would be charged to Englewood's account.

HUD's May 3, 2002 Commitment provided the terms and conditions whereby HUD would insure the mortgage loan. A1134-36. On December 2, 2002, Reilly wrote to HUD that it had an investor and had made arrangements with Englewood for the financing of the Section 221(d)(4) loan. A1156-57. The

Assignment of the Firm Commitment was made from Englewood to Reilly on December 12, 2002. A1089-90. It was approved by HUD. A1090.

In the Mortgagee's Certificate of December 12, 2002, Reilly acknowledged that it had received from Englewood the $58,241.50 as the first installment of the mortgage insurance premium, $236,966.00 cash for working capital, and a $458,850 escrow deposit. A1071-75.

The Financial Requirements for Closing set out permissible uses for the funds. A1056-57. It indicated that $9,190,398.00 was to be spent on all of the substantial rehabilitation costs of South Pointe, with $7,083,955.00 for construction, $1,360,685.00 in carrying charges and financing, $101,667.00 in legal costs, and $644,071.00 in contingency. There was $2,457,902.00 in "Cash Available to the Mortgagor," to be used to pay off the CIC and Standard Federal Loans. A1057.

The Amended and Restated Trust Agreement set out the relationship between CT&T and Englewood. A1141-1147. The Trust could take various actions on Englewood's behalf. A1141. The Escrow Agreement Additional Contributions by Sponsors permitted CT&T to accept Englewood additional contributions from Englewood that were conditions of HUD's insurance commitment. A1137-40. The Construction Loan Escrow Disbursing Agreement set out the terms under which disbursements would be made. A1103-09.

At the request of the Owner/Borrower, lender will make periodic deposits into the escrow to be disbursed by the escrowee in accordance with this agreements as hereinafter set forth, Owner/Borrower may deposit or cause to be deposited funds not a part of the mortgage proceeds into this escrow which those funds will also be disbursed by the escrowee under the provisions of this agreement. A1105.

Periodic Advances were made on the Reilly loan throughout December 2002 through May 2004. All of the Applications of required Englewood to certify that "We hereby authorize you to advance same <u>and charge our account therewith</u>." (Emphasis added). All of the payments requested via Reilly advances went to the general contractor, the architect, Reilly for construction period interest, for real estate taxes, or for change orders reflecting additional costs: (Draw #1, Excess Mortgage Proceeds of $2,457,902-A1059; Draw #5, real estate taxes-A1110-1112; Draw #9, real estate taxes-A1114-1115; Draw #12, mortgage insurance payment-A1119-1120; and Draw #18, change order-A1122-1124).

The loan proceeds were also used to pay monthly interest payments on the Reilly loan. See e.g. A1118,A1121,A1125. Englewood's failure to make the June interest payment led to the notice of default and the foreclosure proceedings.

In May 2004, Reilly declared the mortgage in default and accelerated the debt. In July 2004, Reilly filed a foreclosure suit. A year later, Reilly informed HUD that the mortgage had been assigned back to HUD, and the assignment recorded. A1190. HUD then sold the Reilly Note and Mortgage at a public

auction for $2,300,000.00. A1192. The buyer then foreclosed in June of 2006 and sold the fee simple interest in South Pointe to another party for $7,500,000.00, a six-month gain of $5,200,000.00.

On September 26, 2005, Anderson sent a copy of a fax of Receiver claims for reimbursement for $335,210.00 in Reilly advances – a December 11, 2002 insurance premium of $87,082.00, the February 19, 2004 $129,628.00 first installment on the 2004 real estate tax bill, and the April 20, 2004 $20,000.00 payroll advance and $98,500 gas company payment. A1192. In addition, it requested $329,204.00 for various costs of operation from June through September 2004. *Id.*

### C. Englewood's Legal Obligations Were Not Waived or Given Away, and did not "Fail to Come into Being." HUD Simply Took Back Its Collateral.

The Claims Court determined on remand that Englewood's obligations were effectively "waived or given away or didn't come into being because HUD paid those debts." A23. That is incorrect. Englewood borrowed funds, documented by a Note, Mortgage, and other closing documents, for which it had repayment obligations. Englewood had to pay the loan back or lose a building that had a land value of $2.3 million, improvements of $7 million, and $1.4 million in partnership advances.

On October 17, 2005, the Cook County Circuit Court approved the
Receiver's Final Report and discharged the Receiver. A1183-87. The order
provided that: "HUD has elected to enforce its rights under the mortgage and the
National Housing Act by an action in the United District Court for the Northern
District of Illinois." A1185. On October 13, 2005, the district court granted HUD
possession of South Pointe.

Mary Anderson provided an affidavit in support of the HUD foreclosure
action. A1188-91. HUD was responsible for paying mortgage claims. A1188.
Reilly was the mortgagee, and that the mortgagor was the Trustee pursuant to the
terms of their Trust Agreement. A1189. Englewood was responsible for making
payments due under the Mortgage Note and Mortgage. A1189. A copy of the
Amended and Restated Trust Agreement was attached. A1189.

Reilly declared the mortgage in default in May 2004. A1190. In July 2004,
Reilly filed for foreclosure and the appointment of a receiver. *Id.* On July 27,
2005 Reilly assigned its insurance claim to HUD. *Id.* On September 26, 2005,
HUD received a breakdown of claims that Reilly had submitted to HUD for claims
from December 11, 2003 to July 2005. A1192. The list contains amounts and
dates for the twelve payments in from the insurance claim for $87,082.00 on
December 11, 2003 to $150,000.00 for "operating deficits" on August 17, 2004. *Id.*

### D.     HUD Made a Bad Business Decision.

HUD's decision to insure the Reilly mortgage loan with Englewood was a bad business decision. No lender and no one on HUD's staff believed that the units could be marketed in Englewood without the deep HAP subsidy.  Englewood wrote to Hinsberger that it did not believe South Pointe could work without HAP subsidies. A857-60.  South Pointe would be receiving the benefits of the 2000 HAP contract that it should have been receiving all along. *Id*.

The pictures show that Englewood was an attractive building, next door to an unattractive alternative, across the street from a newly constructed community college, and in an area of East Englewood that was showing signs of new construction and investment. A860-72,A873-77.

The inferior building so the south of South Pointe sold for $29,255 a unit in 2006.   A878. South Pointe was appraised at $6,750,000 in November 2000. A885.  The HUD staff's comments were unreasonably weighted to the inflated expense numbers of 1999 through 2001, not on normalized expenses.  A880-881. Even then, HUD showed a valuation of $3,645,000, substantially above the Englewood's December 31, 2001 CIC debt of $1,500,000.

Hinsberger responded: "Please keep the project moving forward.  We do expect the renovations to be completed. There are sufficient funds to accomplish this."  A858.  Englewood responded that, if the 2000 HAP contract had been

reinstated, there would have been three years of project based Section 8 payments, 100% occupancy, and South Pointe could be marketed with no or a substantially reduced subsidy. In 2002, the fact that South Pointe was rehabilitated to a "like new" standard did not matter. Englewood residents could not afford to live at South Pointe.  A857-859.

HUD's counsel, in his final argument, asked the question why the loan failed: "Did the loan fail for bad planning, wrong projections, wrong financial projections, something else?"  The answer was that the loan failed because there was not a market in Englewood for high-rise apartments without a HAP-like subsidy. A "like new" building would not alter the basic reality that the

This was proven when the Reilly Note and Mortgage were sold at a public auction in November of 2005.  The $11,648,300.00 Reilly Note and Mortgage on South Pointe were sold for only $2,300,539.00.  A1182.  That result is inexplicable when one reviews pictures of South Pointe, immediately to the east of a new community college, a K-8 school across the street, an elevated mass transit stop a block away, and in comparison with South Wind, a clearly inferior building that sold for $29,255.00 a unit in the first quarter of 2006. A860-72.   The loan failed because market conditions *in 2002* could not support the project as Hinsberger envisioned without subsidized rents.

### E.    Englewood's evidence was adequate.

The court made repeated comments about the inadequacy of the evidence in the remand decision.  But at trial, the general ledger materials were adequate to support the determination, affirmed by this Court, that Englewood lost $3,272,017 in revenue from the breach. There was testimony that the general ledger entries were normal business records. There was no objection by HUD or limitation placed on their use. This Court accepted them.

These are the same business records introduced and accepted into the record at trial.  The entries were made daily from 2002-2004, and then the 2002, 2003 and 2004 entries were copied in 2006 for trial preparation purposes.

The Claims Court said:

> The first page of plaintiff's trial exhibit 13, the first exhibit which contains portions of the general ledgers, is included below to demonstrate their inadequacy.  A26.

The court followed up:

> The court cannot rely on the information in plaintiff's trial exhibits 12, 14 or 16, as it cannot for plaintiff's trial exhibits 13, 15 or 17.  A28.

The court does not explain their "inadequacy." The court simply points to an unrepresentative sample page (A27) "to demonstrate their inadequacy."

Compare the document presented by the court in its opinion (A26-27) with the comprehensive materials produced at trial.  2002-A973-91; 2003-A997-1014; 2004-A1016-24.

43

All of the documents related to the Reilly loan closing were produced in November by Englewood. They document the transaction and the sources and uses of funds in the Reilly loan to create the like new building.

## II. HUD FELL SHORT OF SATISFYING THE ANALYTICAL STRUCTURE FOR DETERMINING SAVINGS SET OUT BY THE FEDERAL CIRCUIT.

### A. HUD's Insurance Endorsement was Conditioned on Englewood's Contribution of Funds to the Construction Loan Escrow Account.

On May 3, 2002, HUD issued a Commitment for the Insurance of Advances to the Englewood Terrace Limited Partnership. A1134-36. It provided that HUD would endorse, for insurance, a mortgage note for $11,648,300.00 at an interest rate of 6.93%, resulting in monthly payments of $71,794.68, or $861,536.00 a year. HUD made its final rejection of Englewood's administrative appeal on May 2, 2001. CIC reinstated its foreclosure complaint the same day. Then HUD offered the 221(d)(4) commitment on May 3, 2001.

The Commitment provided the only option available to Englewood for refinancing the CIC loan and mitigating the damages resulting from HUD's breach of the 2000 HAP contract. HUD did not renew and abated the HAP contract on October 1, 2001, which caused occupancy and rental income to drop to 65% by June 2002, and to 35% by September 2002. The condition of the HUD insurance commitment was that Englewood had to create a "like new" building for a

mortgage loan total of $11,648,300.00, with an annual debt service cost of $861,536.00.

Hinsberger insisted that the quality of the new building would generate the marketplace rents, so the HUD subsidy was not needed. This was sheer fantasy, as the facts revealed.

The Commitment required the creation of a deposit of $232,966.00 to be used for taxes, mortgage insurance premiums, and property insurance. A1134-36. There was a second requirement that Englewood make a deposit of $458,850.00 to fund an "accounts payable" fund. *Id*. And there was also a requirement that Englewood pay $58,241.00 for the Mortgage Insurance Premium. *Id*.

On December 6, 2002, IHDA confirmed that it had made a $750,000.00 loan to Englewood. A1158. It was for the deposits required by the Reilly Loan. On December 12, 2002, Reilly executed the Mortgagee's Certificate (indicating that it had received: the $58,241.00 for the payment of the mortgage insurance premium; $232,966.00 in cash taxes and insurance, and $458,850.00 to fund an initial operating account escrow account. A1971-75. Englewood paid a total of $750,057.00, essentially the funds that Englewood had borrowed from IHDA.

The Escrow Agreement Addition Contribution by Sponsors agreement (A1137-40) provided that CT&T could accept additional contributions of the sponsors other than loan proceed from Reilly. It acknowledged that the project

45

was dependent upon the FHA insurance, and that the Insurance Commitment was "conditioned upon the assurance that additional funds be made available for project purposes, primarily for the absorption of any deficit resulting from the operation of the project during the initial period of occupancy." A1137-38.

The disbursements from Englewood's and Reilly's deposits would be made through the Construction Loan Escrow Disbursing Agreement at Englewood's direction and for its benefit. A1103-09. The Disbursing Agreement provided that: "At the request of the Owner/Borrower lender will make periodic deposits into the escrow to be disbursed by the escrowee in accordance with this agreement." A1105. . It also provided that: "Owner/Borrower may deposit or cause to be deposited funds not a part of the mortgage proceeds into this escrow which these funds will also be distributed by the Escrowee under the provisions of this agreement." *Id*. This is the vehicle whereby the Trust would receive payments from Englewood to be disbursed.

### B. The Federal Circuit Explained the Analytical Structure by which the Claimed Savings Should be Determined.

As discussed above, this Court explained that the damages should be reduced only by expenses Englewood did not pay, <u>unless</u> Englewood retained a legal obligation to repay those expenses. The Claims Court used the following HUD claims of "savings" to reduce the damages award to zero were: (1) the final CIC payment for principal and interest through March 2003 was $1,743,294.00;

46

(2) the payoff of the Standard Federal loan of $764,237.00; (3) $500,196.00 in real estate taxes; (4) $241,661.00 in insurance premiums; (5) construction period interest payments of $618,232.00; and (6) post-construction interest payments of $430,768.00. A23. The total of these claimed deductions was $4,299,388, or $1,027,371 more than the damages award of $3,272,917.

The threshold questions are: (1) whether Englewood retained the legal obligations to repay the expenses from the Reilly loan that HUD was claiming as deductions from the damages award; and (2) whether HUD paid these expenses.

In fact, HUD "paid" no expenses. All of the expenses that were paid were payments by Englewood out of the South Pointe operating account, or payments out of the construction escrow account through direct deposits by Englewood, or from construction draw requests from Englewood to Reilly. The approximately $5.5 million in payments out of the South Pointe operating account (described in detail in the general ledger in PX13, PX15 and PX17) were clearly payments made by Englewood. Englewood provided the funds for the payoffs of the CIC and Standard Federal loans with excess mortgage proceeds, or "money available to the borrower." Englewood also borrowed, with a legal obligation to repay, $750,000.00 from IHDA to meet the applicant deposit requirements for the Reilly loan.

All of the payments for construction and construction period interest came from draw requests by Englewood to CT&T and charged to Englewood. The payments for construction period real estate taxes were paid out of the construction escrow account with funds provided by Englewood. Reilly provided the funds for payment of 2004 real estate taxes and some expenses for operation in 2004. HUD paid nothing.

Finally, in 2005, Reilly assigned its insurance claim to HUD for its loss on the default of the Englewood mortgage and other additional costs along the way that would be reimbursed under the provisions in the mortgage. At that time, Englewood retained its legal obligations to repay Reilly for all of the loan expenses incurred by Reilly on its behalf.

HUD's financial involvement occurred in November 2005, when HUD had to pay Reilly for its mortgage insurance claims and HUD had the right to foreclose on the property to obtain a fee simple interest in the real estate. HUD elected to pay the Reilly claim and sell the Note at a public auction in November of 2005. HUD paid the Reilly insurance claim on the Reilly mortgage with Englewood. It was an insurer or guarantor of Reilly's right to receive the benefits of its mortgage loan. While all this was happening, from Reilly's Notice of Default, to the appointment of a receiver to manage South Pointe for fifteen months, to the Note's sale at the public auction in late 2005, to the actual foreclosure in June of 2006, Englewood

retained the legal obligation to repay the Reilly advances. Accordingly, under this Court's directive that "if Englewood retained legal obligations to repay these expenses they would not need to be deducted," the Claims Court improperly deducted the amounts from the damages Englewood sustained.

Englewood retained the legal obligation to repay Reilly advances through June of 2006. At that time, HUD elected to liquidate Englewood's legal obligations by foreclosing and selling South Pointe. It was only when Reilly assigned its mortgage insurance claim on the Englewood Note to HUD that HUD had to make any payment, and that was to Reilly, not to any supplier, contractor or provider of services. Accordingly, HUD did not "pay" anyone, other than Reilly on its mortgage insurance claim.

### C.    HUD's Individual Claims Do Not Meet the Analytical Structure Set up by the Federal Circuit.

The threshold questions were whether Englewood retained a legal obligation to repay expenses first paid by Reilly, and whether HUD actually paid those expenses. Assuming that HUD can overcome that hurdle, the next level of inquiry goes to the details and contexts of the claims.

> The Claims Court must reduce the award by any operational costs or expenses Englewood did not pay but would have been obligated to pay if HUD had not breached the HAP contract.

This requires the satisfaction of four criteria: (1) the claimed deduction has to be an obligation of Englewood; (2) it has to be an operational expense; (3) it has to be an

obligation that Englewood did not pay; and (4) it has to be a proximate result of the HUD breach of the HAP contract, a payment that Englewood would have had to pay even if there was no breach. As detailed below, HUD failed on this count as well.

### D. HUD Has Fallen Short in Meeting the Federal Circuit's Evaluation Criteria

HUD did not make any contributions to the CT&T escrow account which was the vehicle for paying all bills, upon Englewood's approval and direction, which were then charged to its loan balance with Reilly. The rehab loan was set up to provide for the following: (1) payoff of the CIC and Standard Federal loans; (2) all of the transactional costs associated with the rehab loan; and (3) the costs of construction, construction period interest, architectural supervision and one year of construction period operational costs associated with real estate taxes and property insurance. All of the disbursements claimed by HUD as deductible savings were made through the CT&T construction escrow account at Englewood's direction and for its benefit. There were no payments made by HUD.

HUD's financial involvement with the Reilly loan was through its mortgage insurance contract with Reilly. It paid Reilly the amount claimed in its assignment in November 2007. HUD could have become involved earlier through a workout or through the reinstatement of the three years of the HAP contract it breached. But HUD elected to stay uninvolved, to accept the assignment of Reilly's $11,648,300

mortgage insurance claim, and sell the Mortgage and Note at a public auction for $2.3 million, a loss of $9,348,000.00. The buyer at the public auction foreclosed and sold the South Pointe fee simple interest for $7,500,000 within six months of its purchase. This demonstrates that the property was valuable and that South Pointe was not in the dilapidated condition HUD claims.

> **1.    HUD could not use Reilly's Damages on Reilly's mortgage loan with Englewood as HUD Savings in its breach of contract award with Englewood.**

Since HUD argued that there was no connection between its breach of the HAP contract and the Reilly loan, there is no basis for HUD to claim $618,232.00 as construction period interest or $430,768.00 as post-construction period interest. Therefore, there was no obligation for Englewood to pay these expenses and the failure to pay them cannot be the basis for a savings to reduce the Englewood damages award. Because there is no connection between HUD's breach of the HAP contract and the Reilly loan, it is inappropriate for HUD to claim expenses solely related to the Reilly loan as deductions from Englewood's damages for its breach of the HAP contract.

> **2.    Englewood paid $750,000.00 in cash into the CT&T construction escrow to pay for construction period real estate taxes and insurance.**

Englewood paid $750,000.00 cash to CT&T, the escrow agent, to pay real estate taxes and insurance during the construction period. It was a condition of the

mortgage insurance commitment. The intention was to use these funds for construction period real estate taxes and insurance. HUD, in explaining why it had to advance funds for the 2004 insurance premium and for real estate taxes in 2004, explained that it had exhausted the funding available in these two accounts.

>   **3.** **Payments on the principal on the CIC and Standard Federal loans were payments for capital assets not operating expenses.**

It was necessary to stay current on the payment of interest on the CIC and Standard Federal loans. The interest costs that Englewood had paid on both loans from 1997 through 2001 were: 1997-$522,674 (A823); 1998-$415,025 (A922); 1999-$319,917 (A904); 2000-$264,836 (A944); 2001-$232,121 (A964).

If HUD had not repudiated its obligation for a multi-year HAP contract on December 6, 2000, Englewood would have had the income stream and time to follow up with CIC and other lenders to restructure the CIC loan or to refinance both the CIC and Standard Federal loans with a conventional lender. As Hayes testified at trial, the loan balances to be financed (approximately $2.3 million) and the amount being spent on interest $232,121.00 (a 10% rate) could have been improved upon in the marketplace. A1221-22.

**4.    Carl Sanders and John Hayes discussed the refinancing of the CIC loan with CIC and other lenders in 1999 and 2000. But the lenders needed the four year HAP contract.**

The CIC loan needed to be refinanced for two reasons. First, operating income was not sufficient to do all the repairs set out in the April 1999 REAC Report. Second, to meet the costs of gas, security work orders, and elevator repairs, Englewood had to make an investment of $770,000.00. Sanders testified at trial that he was working on a $3-$4 million restructuring program to substantially reduce principal payments. A1214. Sanders informed HUD that he was negotiating with CIC for a restructuring of the loan, but that CIC required a four year HAP contract to justify the transaction:

Q    Okay. And what did you mean by, it will not be feasible for them to lend us the fund, unless we have a contract.

A    Well, CIC had basically indicated to, to us that they. . . . would strongly consider what we were asking for in terms of either restructuring or refinancing the property but they must have the, the contract to do so.

Q    And what type of a contract?

A    The four year contract.

A1202.

After the DEC, HUD Multifamily D.C., and HUD Multifamily Chicago approved the Final Report in January 2000 and Englewood repair work in 2000 was approved by HUD, Sanders prepared the renewal request for the four-year HAP contract in July 2000. A1210.

Q       Did you look for a loan from other entities than HUD?

A       Yes, CIC.

Q       And we talked about that?

A       Yes, we talked about that, yes. Community Investment
        Corporation.

Q       And what did CIC require for the loan?

A       They required the four year contract. They said that's exactly
        what they required.

A1216.  Sanders explained the situation in writing to Joan Kiening in August and

September of 1999. A603, A605, A607

        Hayes expanded on Sanders's testimony at trial:

Q       Now, you mentioned restructuring the loan with CIC. What is
        CIC?

A       CIC is , , , , a consortium of, of Chicago banks who invest in
        Community Investment Corporation for the purpose of them
        loaning out to affordable housing communities.

Q       And your contact at CIC is Alvin Zelitsky?

A       Correct.

Q       And you were talking to Mr. Zelitsky about a possible
        refinancing of the CIC loan?

A       Yes, I was.

Q       Why was it that you were looking to refinance that loan?

A       The existing first mortgage had an 11 year amortization and it
        was costing us more than $600,000 in principal and interest and
        that was taking a very, very large chunk out of annual cash
        budget at the property.

A1220-221.

Hayes then explained how an extension of the amortization period to the

traditional 30-year term, there could have been savings of over $300,000.00 in cash

flow. A1221-23.   An interest rate of 7% and a 30-40 year amortization could save

Englewood hundreds of thousands of dollars in CIC debt service. *Id.* But CIC and

other lenders needed to see the four-year HAP contract for this refinance to

happen:

> Q     Now, were there other matters that you had to get in place
>       before you would be able to get a refinancing from CIC?
>
> A     The primary one is that there's a stream of income that your
>       lender can count on to service the debt.
>
> Q     And what did that mean in this instance?
>
> A     That we had a HAP, we needed a HAP Contract, a HAP
>       Contract that would be extended for multiple years rather than a
>       one year.
>
> Q     And why did you need that?
>
> A     Because it would, it would give the lender, CIC in this case, or
>       any other lender the comfort level they're looking for that
>       there's a stream of revenue over more than one year to service
>       their debt every year.

A1223.

Hayes applied to HUD in July 2000 for a four-year HAP renewal and a rent

increase of two percent.  A1227. While waiting for HUD to make its decision on

the rental increase and a 221(d)(4) loan in 1999 of $3 million, Englewood invested

$770,000.00 to make repairs and to pay operating expenses in 1999 and 2000.

A1226.

Q       And why is it that you asked for a four year contract renewal?

A       Well, that was the only way that I could get any lender to look at a refinancing of the property, was to have a multiple year HAP Contract, one that's more than one year so they could have some assurance that there was a stream of revenue coming in.

A1227-28.  The story was predictably the same with other lenders.  Lenders needed a multiyear HAP contract to support a multiyear loan.  Hayes thought lenders would be just as interested in the three automatic one-year renewals as the four-year contract:

Q       What was the term of the [2000] contract?

A       It was for one year, and automatic renewals for three additional one year terms.

Q       Now, did you have any reaction to that provision?

A       No, well, it wasn't exactly what I asked for. I asked for four years and I got one year plus three automatic extensions, but it's, it was close enough that I knew that I could take this to lenders for refinancing.

A1228-29.

> **5.    Englewood was financially viable until HUD destroyed it with the HAP Contract Breach.**

Both HUD and the Court said repeatedly that Englewood would have lost the HAP account whether or not HUD breached the HAP contract and denied it the revenues it would have received from October 1, 2001 through September 30, 2004.

That is wrong for two reasons. First, the HAP contract provided in Section

19(e) that HAP contract payments would continue to be made even in foreclosure

situations:

> Section 19(e)  Except where otherwise approved by HUD, this Contract, the
> Agreement and the ACC (if applicable) shall continue in effect and housing
> assistance payments will continue in accordance with the terms of this
> Contract in the event:
>
> 1. Of assignment, sale, or other disposition of the project or this
>    Contract, the Agreement of the ACC,
> 2. Of foreclosure, including foreclosure by HUD,
> 3. Of assignment of the mortgage or deed in lieu of foreclosure,
> 4. The PHA or HUD takes over the possession, operation or
>    ownership,
> 5. The Owner prepays the mortgage.
>
> A544-45.

The reason for this provision is to permit the HAP contract to continue as an asset

of the owner in foreclosure situations, to continue HAP payments to very low-

income families regardless of the financial condition of the owner.

HUD, and the court, were operating on the assumption that the CIC

foreclosure would automatically terminate the HAP payments available to

Englewood.  It seems clear from Section 19(e) that Englewood could have come to

the CIC foreclosure negotiations with the restoration of the full HAP payments that

it should have had on May 1, 2002, as well as the prospect for future HAP

payments through September 2004. The April and May HAP payments were more

than adequate to bring the CIC mortgage current, which would have required a payment of only $55,000. A979.

The second reason it is wrong is because the financial statements from 1997 show that Englewood's South Pointe property was financially successful. It was making a profit in the conventional real estate economics of net operating income, less interest. Operating Income remained relatively stable around $2,700,000 and that operating expenses were about $1,800,000 in 1997 and 1998, the last two years before the significant increase in expenses related to repairs, gas costs and evictions in 1999, 2000 and 2001.

Net Operating Income, essentially the proxy for profit in subsidized housing developments like South Pointe, varied from a high of $936,003 in 1998 to a low of $350,768 in 2001. After considering the addition of interest income and the deduction of interest costs, the Net Income varied from a low of $169,346 in 2001 to a high of $577,721 in 1998. CIC debt was reduced from $3,466,677 in 1997 to $1,559,279 in 2001. And interest expenses have decreased from $522,674 in 1997 to $232,121 in 2001:

| Financial Statements | | 1997 | | 1998 | | 1999 | | 2000 | | 2001 |
|---|---|---|---|---|---|---|---|---|---|---|
| Cover Sheet | A819 | | | | A901 | | A941 | | | |
| Operating Income | A823 | $2,537,384 | | $2,742,845 | A904 | $2,669,522 | A942 | $2,653,377 | A964 | $2,675,296 |
| Operating Expenses | | $1,807,018 | | $1,806,842 | | $2,138,830 | | $2,117,214 | | $2,324,528 |
| Net Operating Income | | $730,366 | | $936,003 | | $530,692 | | $536,163 | | $350,768 |
| Interest Income | | $38,027 | | $56,743 | | $62,731 | | $61,190 | | $50,699 |
| Interest Expense | | $522,674 | | $415,025 | | $319,917 | | $264,836 | | $232,121 |
| Profit (Loss) | | $245,719 | | $577,721 | | $273,506 | | $332,517 | | $169,346 |
| Reduction of Debt | A824 | $817,933 | | $753,968 | | $742,641 | A946 | $454,221 | A943 | $602,277 |
| CIC Debt | A822 | $3,466,667 | | $3,047,742 | A903 | $2,592,353 | A943 | $2,097,522 | A963 | $1,559,279 |
| Michigan National | | $1,010,324 | | $950,324 | | $890,324 | | $835,000 | | $775,234 |
| Partner's Equity | | $1,545,474 | | $2,357,797 | | $2,815,154 | | $3,364,298 | | $3,153.54 |
| CIC Mortgage | | | | $278,824 | | $233,771 | | | | |
| Michigan National | | | | $136,201 | | $80,491 | | | | |

On December 31, 2001, Englewood had a $1,559,279 mortgage balance on its CIC loan and a combined interest payment of $232,121 on both the CIC and Michigan National loans.  The CIC portion of the combined interest payments was reduced from $278,824 (in 1998) to $233,771 (in 1999). It seems logical that the loan balance of $1,559,279 on December 31, 2001 would be reduced to $100,000 to $120,000 in 2002.

Thus, South Pointe was in a good financial position as of December 31, 2001.  It had a loan balance of only $1,559,279.  Hayes testified that with a three-year HAP payment that he could finance that amount at 7% , saving hundreds of thousands of dollars in debt service costs.  His testimony also emphasized that the refinancing would require the availability of a four-year HAP contract.  He had

that contract only briefly between October 18, 2000 and December 6, 2000, a period of less than two months. The CIC debt was only $2,097,522 on December 31, 2000 when a 7% interest rate would have costs only $150,000. But without the clear availability of the four year HAP contract. with annual rent increases, Englewood was not able to engage in serious refinancing discussions with lenders from December of 2000 through December of 2001.

## III. ENGLEWOOD HAS IDENTIFIED CERTAIN OPERATIONAL EXPENSES NOT CITED BY HUD OR THE CLAIMS COURT WHICH ARE THE ONLY PROPER DEDUCTIONS, IF ANY, FROM THE DAMAGES AWARD.

Both the Claims Court and HUD misapprehended this Court's directive on remand. This Court affirmed the determination that Englewood had demonstrated that it sustained $3,272,217.00 in lost revenues. The question the Claims Court should have put to the parties is: how much would Englewood have had to spend in operational expenses to generate that revenue, and what portion of that amount did it not spend? The answer –to the correct question is, at most, $1,254,164.

If we were to follow the policy informing the requirement that the operating expenses required to generate the revenue should be deducted, we would include as offsets to savings: (1) the 2004 real estate taxes not  paid for during the construction period; that amounted to $129,628 advanced by Reilly on February 19, 2004; (2) the $87,082 advanced by Reilly. to supplement the $80,000 paid by Englewood, for the payment of the 2004 insurance premium; (3) the total of those

two advances is $216,710, and the other operating expenses advanced by Reilly

and documented in the receiver's report amounted to $465,244; the total of all

operating expenses advanced by Reilly for operating expenses was $681,954.

What interest on the CIC and Michigan National loans would Englewood

have had to pay if HUD did not breach the HAP contract? The combined interest

payments to both CIC and Standard Federal were on a steady decline from

$522,674 in 1997 (A823), to $415,025 in 1998 (A922), to $319,9I7 in 1999

(A904), to $264,836 in 2000 (A944), to $232,121 in 2001 (A964).

These were combined interest payments, to both CIC and Michigan National

with between 67% and 73% represented by the CIC contribution to the overall

interest charge. The foreclosure sought per diem interest charges of $454.79 for

2002. A1151. That amounts to $165,998 for the 365 days of 2002. The Michigan

National and CIC interest would be no more than $232,121 in 2003 and 75% of

$232,121 for the nine months of 2004 ($174,090). Therefore, the maximum

amount of interest "saved" by Englewood from HUD's breach of the HAP contract

would be $572,210.

If the interest savings of $572,210 from 2002 through September of 2004

were added to the maximum amount of Reilly advances for operations of

$681,954, the maximum total savings to Englewood for not having to pay some

operating costs in 2004 and interest charges from January 1, 2002 through

September 30, 2004 would be $1,254,164.  That is the proper number to be

deducted from the damages award of $3,272,017, leaving a net award to

Englewood of $2,017,853.

## IV.   THE IMPLEMENTATION OF SOME FORM OF RENTAL INCREASE IS REQUIRED BY LAW AND CANNOT BE WAIVED OR DENIED BY BLAMING THE OWNER.

The plain and unambiguous meaning of a statute prevails in the absence of

clearly expressed legislative intent to the contrary.  *Belkin Int'l, Inc. v. Kappos*, 696

F.3d 1379, 1381 (Fed.Cir. 2012).  Here, the plain an unambiguous language in

MAHRA § 524(c) <u>requires</u> the implementation of some form of rental increase <u>no</u>

<u>matter what</u>.  There is nothing in the statute that permits waiver of the increase, and

HUD cannot escape its obligation to comply by raising hyper-technical arguments

about incomplete paperwork.

Section 524(c) stated that:

Rent Adjustments After Renewal of Contract.--

(1) <u>Required</u>.-After the initial renewal of a contract for assistance
under section 8 of the United States Housing Act of 1937 pursuant to
subsection (a), (b)(1), or (e)(2), the Secretary <u>shall annually adjust the</u>
<u>rents</u> using an operating cost adjustment factor established by the
Secretary (which shall not result in a negative adjustment) or, upon
the request of the owner and subject to approval of the Secretary, on a
budget basis.

Pub. L. 106-74, § 531, 113 Stat. 1109, 1113 (1999) (emphasis added).  As the

Claims Court recognized in *Englewood II*, "shall annually adjust the rents" is an

imperative; it must happen. *Englewood II*, 79 Fed.Cl. 516, 549-550 (Fed.Cl. 2007), *citing Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1061 (Fed.Cir. 1995).

The statute could not be more plain and unambiguous: there must be some adjustment to the rents, and it cannot be negative. *Id*. The adjustment <u>may</u> be on a budget basis upon the owner's request and subject to approval, but there <u>shall</u> be an upward adjustment. *Id*. This is a requirement on HUD, not the owner. Thus, under the statute's plain language there is either an OCAF adjustment or a budget basis adjustment if requested and approved. But it is not permissible under the statute for there to be no adjustment.

HUD and the Claims Court avoided this issue by claiming waiver and failure to preserve the contention. Neither position prevails. The statute obligates HUD, not the owner, to annually adjust the rents. MAHRA § 524(c). There is nothing to waive because the onus is on HUD, not the owner, to comply. The only obligation that the statute places on the owner is that, if it wants to use a budget basis instead of OCAF, it must make a request and obtain approval. Otherwise, the OCAF increase <u>shall</u> be implemented. *Id*.

The claim that Englewood raised the claim too late fails for the same reason. First, Englewood may have been lulled to sleep by the fact that the Claims Court raised the issue itself in *Englewood II*, leading Englewood to believe that the issue

was already before the court and did not need to be raised immediately.  In any event, the obligation to adjust the rents upward is HUD's obligation, not Englewood's.  HUD should not be permitted to flagrantly violate federal law by hiding behind Englewood's perceived failure to expose their malfeasance soon enough.

Lastly, even assuming that a legitimate preservation argument may be made here, this Court has the discretion to consider the argument anyway, particularly where the question presents an issue of law that does not require additional fact-finding or consideration will avoid a manifest injustice.  *See, e.g., Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 114 (2d Cir. 2005).  This issue is a pure question of law concerning the proper interpretation of Section 524(c) and requires no fact-finding.  Moreover, it constitutes a manifest injustice for HUD to avoid its statutory obligations based upon a technicality.

If Englewood is granted the OFAC adjustment that the law requires, then its total lost revenues would be $3,884,017.  Deducting the amounts discussed in Point III, *infra* - $1,254,164 - the total damages to Englewood are $2,629,853.  Accordingly, the net award to Englewood should be$ 2,629,853, or at least $2,017,853 (the original damages award of $3,272,017 less $1,254,164).

## CONCLUSION

For the reasons stated below, the judgment appealed from should be reversed, and the matter remanded for entry of a judgment in Englewood's favor in an amount not less than $2,017,853, together with such other and further relief to Englewood as this Court deems just and proper.

Respectfully submitted,

/s/ Don S. Samuelson
DON S. SAMUELSON
1745 Broadland Lane
Lake Forest, Illinois 60045
(847) 420-1732
DSSA310@aol.com

*Counsel for Appellant*

# ADDENDUM

# In the United States Court of Federal Claims

No. 03-2209 C

**ENGLEWOOD TERRACE
LIMITED PARTNERSHIP,
a Michigan Limited Partnership**

          **JUDGMENT**

    **v.**

**THE UNITED STATES**

Pursuant to the court's Opinion, filed November 22, 2013,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the HAP contract damages previously awarded to plaintiff by this court for breach damages, are reduced to zero.

                         Hazel C. Keahey
                         Clerk of Court

**November 25, 2013**        By:    s/ Debra L. Samler

                         Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $455.00.

A1

# In the United States Court of Federal Claims

### No. 03-2209C
### November 22, 2013

```
* * * * * * * * * * * * * *   *
```
| | |
|---|---|
| **ENGLEWOOD TERRACE LIMITED** * | |
| **PARTNERSHIP, a Michigan** * | **Limited Remand for Recalculation** |
| **Limited Partnership,** * | **of Lost Profits Damages for** |
| * | **Contract Breach.** |
| **Plaintiff,** * | |
| **v.** * | |
| * | |
| **UNITED STATES,** * | |
| **Defendant.** * | |
| * | |
```
* * * * * * * * * * * * * *   *
```

    **Donald S. Samuelson**, Law Offices of Donald S. Samuelson,[1] Lake Forest, Illinois, for plaintiff.

    **Douglas K. Mickle**, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Bryant G. Snee**, Acting Director, Commercial Litigation Branch, and **Stuart F. Delery**, Assistant Attorney General. **Gregory G. Gustin**, **Maria T. Baguio**, and **Lorraine C. Shoto**, Office of General Counsel, United States Department of Housing and Urban Development, Chicago, Illinois, of counsel.

### O P I N I O N

<u>**HORN, J.**</u>

    The issue before this court is the result of a limited remand by the United States Court of Appeals for the Federal Circuit in the above captioned case on one portion of the damages calculation previously determined by the court. The Federal Circuit affirmed most of the factual findings and legal conclusions of this court's earlier opinion, but remanded to this court, for further review on the single issue of a possible reduction in the $3,272,217.00 award to the plaintiff, Englewood, of lost profits stemming from a breach by the United States Department of Housing and Urban Development (HUD) of the 2000 Housing Assistance Payment (HAP) contract between the plaintiff and the government. The Federal Circuit indicated in its decision that a remand is necessary "to

---

[1] Mr. Samuelson, the principal of Englewood Terrace Limited Partnership (Englewood), previously had retained counsel during the pre-trial and trial phases of this case. At some point after the trial, Mr. Samuelson, a licensed attorney, opted to represent Englewood.

determine an appropriate reduction in the award to the plaintiff (a reduction that could entirely eliminate the lost profits award)." Englewood Terrace Ltd. P'ship v. United States, 479 F. App'x 969, 973 (Fed. Cir. 2012) (Englewood VII) (not selected for publication). As stated by the Federal Circuit, the limited issue to be addressed on remand is a possible reduction of Englewood's damages award "by any operational costs or expenses Englewood did not pay but would have been obligated to pay if HUD had not breached the HAP contract." Id.

The relevant background and facts of the Englewood case have been addressed extensively by this court in its multiple, previous opinions, which, after a lengthy trial, found among other conclusions, that defendant, had breached the 2000 HAP contract it had entered into with Englewood, and that plaintiff was entitled to lost profits damages as a result of the defendant's breach. See Englewood Terrace Ltd. P'ship v. United States, 79 Fed. Cl. 516 (2007) (Englewood II); Englewood Terrace Ltd. P'ship v. United States, 94 Fed. Cl. 116 (2010) (Englewood V), aff'd in part, rev'd in part and remanded, 479 F. App'x 969 (Fed. Cir. 2012).[2] The relevant facts also were addressed on appeal in the opinion issued by the Federal Circuit. See generally Englewood VII, 479 F. App'x 969. The findings of fact previously made by this court and the Federal Circuit are incorporated into this opinion with additional findings of fact based on this court's review after the remand. Only the most relevant facts previously found are briefly reiterated below, including those specifically related to calculating "an appropriate reduction in the award to the plaintiff," as mandated by the Federal Circuit. Id. at 973. The court also, once again, has reviewed the trial record, as well as the submissions of the parties on remand.

## FINDINGS OF FACT

Englewood alleged, and both this court and the Federal Circuit agreed, that HUD breached the HAP contract between Englewood and HUD. The HAP contract provided for rent subsidies to be used by the tenants of South Pointe Towers (South Pointe), a high-rise apartment building in Chicago, Illinois. South Pointe was owned by Englewood Towers Limited Partnership. John J. Hayes was president of P.M. Group, Englewood Terrace Limited Partnership's general partner, until December 13, 2002. Mr. Hayes' P.M. One was the managing agent at South Pointe. On December 13, 2002, DSSA New Englewood Terrace LLC (DSSA), a sole proprietorship of Donald S.

---

[2] Englewood I was an opinion issued by Judge Victor J. Wolski, the original Judge assigned to the case. See Englewood Terrace Ltd. P'ship v. United States, 61 Fed. Cl. 583 (2004). Subsequently, the case was re-assigned to the undersigned Judge, who issued Englewood II, 79 Fed. Cl. 516, Englewood Terrace Limited Partnership v. United States, 84 Fed. Cl. 649 (2008) (Englewood III), Englewood Terrace Limited Partnership v. United States, 86 Fed. Cl. 720 (2009) (Englewood IV), Englewood V, 94 Fed. Cl. 116, and Englewood Terrace Limited Partnership v. United States, 96 Fed. Cl. 614 (2011) (Englewood VI). In 2012, the United States Court of Appeals for the Federal Circuit issued Englewood VII, 479 F. App'x 969. This opinion on remand is Englewood VIII.

Samuelson, replaced P.M. Group as Englewood's general partner. Earlier, on December 1, 2001, Mr. Samuelson's DSSA Management, Inc., which was affiliated with Mr. Samuelson's DSSA New Englewood Terrace LLC, replaced P.M. One as South Pointe's managing agent.

The HAP contract at issue was executed in October 2000 and called for a one year term, followed by three automatic one-year renewals, which would have continued the contract through September 2004.[3] This court previously found that, in December 2000, HUD unilaterally amended the HAP contract, without Englewood's authorization, into one consisting of a series of short term agreements with no automatic renewals. The short term agreements permanently ended on September 30, 2002, after the final short term agreement expired and all tenants had been given housing vouchers permitting them either to remain at South Pointe, or to relocate to other housing with their vouchers. This court found that HUD "should be held to the terms of the original HAP contract it made in October, 2000." Englewood II, 79 Fed. Cl. at 535.

Englewood's original claims stemmed from HUD's termination of Englewood's HAP contract with HUD. HUD based its termination of the HAP contract on its finding in a March 2, 2001 HUD inspection of South Pointe that Englewood had not provided decent, safe, and sanitary housing to tenants, as required by the HAP contract. After

---

[3] As indicated in this court's previous opinions, Englewood and HUD first executed a HAP contract for South Pointe in 1998, and the 1998 HAP contract's one-year term was October 1, 1998 through September 30, 1999. The 1998 HAP contract was renewed in 1999, for the one-year term of October 1, 1999 through September 30, 2000, and all of the provisions of the 1998 HAP contract remained unchanged for the 1999 HAP contract, except for the rent adjustment provisions. For the 2000 HAP contract, the provisions of the expiring 1999 contract again were renewed between HUD and Englewood, with adjustments to the rent provisions, and the term in the 2000 HAP contract was for one-year, from October 1, 2000 through September 30, 2001. Unlike the 1998 and 1999 HAP contracts, however, the 2000 HAP contract also stated that: "After expiration of the initial term, this Contract shall renew automatically for 3 additional one-year terms, subject to the availability of appropriations in any year." Additionally, for the 2000 HAP contract, Englewood also agreed to an addendum to the HAP contract, as a condition of renewal, which stated that:

> in the event HUD's Real Estate Assessment Center (REAC) issues a physical inspection report to the Owner that has a score which evidences Owner failure to comply with HUD's Uniform Physical Condition Standards and Physical Inspection Requirement, . . . HUD may terminate the Contract after the renewal providing the Owner a reasonable period, as determined by HUD, to correct deficiencies or if the Owner fails to perform under an approved Correction Action Plan to Repair.

Englewood II, 79 Fed. Cl. at 519.

3

A4

lengthy trial proceedings, this court found that HUD's decision to terminate Englewood was made even before HUD had received Englewood's plan to correct deficiencies identified in the March 2, 2001 HUD inspection.  The court concluded that Englewood had not been afforded a full and meaningful opportunity to cure the deficiencies identified in the March 2, 2001 HUD inspection.  The record reflects that, although HUD had urged that South Pointe be placed under new ownership and management, once new management and ownership was in place, under the direction of Mr. Samuelson, there appeared to be a reluctance on the part of HUD to provide a meaningful opportunity for the new ownership and management to take corrective action.  HUD also was unwilling to acknowledge any improvement at South Pointe after DSSA took over. HUD's actions, thereby, undermined its contract termination action against Englewood.

On October 1, 2001, Edward Hinsberger, Director of the Chicago Office of Multifamily Housing for HUD, sent an email to Mr. Hayes and Mr. Samuelson stating that "[t]he [Chicago] Housing Authority has advised us that they will begin issuing vouchers for the residents at South Pointe today . . . . As a result, the Sec. 8 [HAP] contract will be terminated once all of the residents receive their vouchers."  Mr. Hinsberger alleged at trial that vouchers did not begin to issue until June 2002.

The occupancy rate at South Pointe began to decline in the spring of 2002.  It dropped below 85% in April 2002 and below 70% by June 2002.  It continued to decrease steadily through October 2002, the month following the expiration of the HAP contract, when the occupancy rate dwindled to 35%.  HUD phased out the HAP contract in stages.  HUD permanently would cease to pay a HAP subsidy for a specific unit whenever its tenant used the Chicago Housing Authority (CHAC) voucher, either to leave, or, if the unit was acceptable, to remain at South Pointe.  HUD also permanently stopped HAP payments when a unit that had received the subsidy became vacant for any other reason.[4]  During this time, the costs to run South Pointe remained constant for Englewood, and it continued to pay high interest payments on its loan from Community Investment Corporation (CIC).

In January 2002, Englewood defaulted on its CIC loan.  CIC filed a foreclosure action, which was voluntarily withdrawn in March 2002, and then reinstated in May 2002. CIC withdrew the action a second time after it received assurances that Englewood would obtain a new loan, insured by HUD, which would pay off the entire old mortgage and provide funds for a complete rehabilitation of South Pointe.  This second loan was provided through Reilly Mortgage, a private financial institution, but was

---

[4] A HAP contract is building specific, and by living in a building that has a HAP contract, an eligible tenant receives subsidized rent.  A CHAC voucher, on the other hand, can be used by the tenant anywhere the CHAC has approved its use.  When a tenant elected to use its voucher, even if it was at South Pointe, Englewood ceased to receive a HAP subsidy from HUD and, instead, received a voucher payment from the CHAC.

4

insured against default by HUD through the section 221(d)(4) loan program.[5]   The section 221(d)(4) loan program, according to the HUD website, requires the property owner to use the loan funds for new construction or "substantial rehabilitation." *Mortgage Insurance for Rental and Cooperative Housing: Section 221(d)(3) and Section 221(d)(4*), http://www.hud.gov/offices/hsg/mfh/progdesc/rentcoophsg221d3n4.cfm.   The Project Development Office of HUD closed on the Englewood HUD-insured loan in December of 2002.   At this time, Englewood also received an additional loan of $750,000.00 from the Illinois Housing Development Authority (IHDA).

In the spring of 2004, after depleting all the funds loaned to it, Englewood defaulted on the HUD-insured, section 221(d)(4) mortgage.  Reilly Mortgage, which had made the loan, replaced DSSA Management Inc., Mr. Samuelson's management company, and assumed responsibility for management of South Pointe on May 21, 2004.  Reilly Mortgage instituted an action in the Cook County, Illinois Court for the appointment of a receiver and for the foreclosure of South Pointe.  In July 2004, South Pointe was placed under court ordered receivership, and Reilly assigned the mortgage to HUD, which eventually sold the mortgage at auction to a private party in 2005.

## PRIOR PROCEEDINGS

Subsequent to the filing of the complaint in the court, during the extensive discovery, and after lengthy trial proceedings, the court issued a series of opinions, listed above.  The remand primarily implicates Englewood V.  In Englewood V, this court focused on plaintiff's damage claims stemming from HUD's previously found breach of the HAP contract.  Plaintiff requested two types of relief: an award of damages for the revenue lost when the government breached the HAP contract, and an award of damages for equity lost when plaintiff defaulted on its mortgage and ceased to own South Pointe.  This court held, and the Federal Circuit affirmed, that plaintiff had "not met the burden of proof for any prong of the lost equity damages test," and that "plaintiff's claim for lost equity damages is far too remote and speculative to allow recovery."  Englewood V, 94 Fed. Cl. at 134; see also Englewood VII, 479 F. App'x at 972.  This court further found, and the Federal Circuit affirmed, that "Englewood can recover damages due to the breach of the HAP contract."  Englewood V, 94 Fed. Cl. at 129; see also Englewood VII, 479 F. App'x at 972.  This court concluded that, "[t]he plaintiff is entitled to recover damages starting on July 1, 2002, through the end of the contract on September 30, 2004.  The occupancy rate of South Pointe is assumed to be 97% for the first five months and 90.5% for the remaining twenty-two months."  Englewood V, 94 Fed. Cl. at 129–30.  The Federal Circuit affirmed both the dates of the damages period and the vacancy rate used to calculate damages.  See Englewood VII, 479 F. App'x at 972.  The only determination of this court not affirmed by the Federal Circuit was the calculation of Englewood's lost profits as a result of HUD's breach of the HAP contract, which the Federal Circuit ordered must be recalculated.  Id.

---

[5] The program is pursuant to the National Housing Act, codified at 12 U.S.C. § 1715l (2006).   Program regulations and eligibility requirements are found at 24 C.F.R. § 221.501 (current through Nov. 14, 2013).

A6

Discovery in this case was long and difficult. The parties, especially the plaintiff, were afforded lengthy, and repeated, pre-trial discovery opportunities. When Mr. Samuelson offered trial testimony regarding plaintiff's damages during the first phase of trial in January 2007, defendant objected that plaintiff was presenting only documents of a demonstrative nature to the court, without supporting documentation. The court allowed plaintiff to defer Mr. Samuelson's testimony to a later phase of the trial in order to allow Mr. Samuelson yet another opportunity to locate better documentation. The trial reconvened in February 2007, at which time Mr. Samuelson testified and alleged that he had "looked for, and found, the backup documentation that supported all the revenue numbers" in Englewood's general ledgers for the years 2002, 2003, and 2004, and the receiver reports for June, July, August, and September 2004. Mr. Samuelson testified that the general ledgers were "the normal way in which we [Englewood] kept our records."

After trial, this court calculated lost profit damages as "Lost Revenue" by determining "the Potential Revenue less the Actual Revenue received." See Englewood V, 94 Fed. Cl. at 130.[6] The values of potential revenue were based on the original terms of the 2000 HAP contract. This court found, and the Federal Circuit later agreed, that the damages period began on July 1, 2002. See id. at 126. This court in Englewood V stated: "[T]he potential revenue for the months of October 2001–June 2002 is $0, as the court has held that the plaintiff cannot begin to recover until July 2002; the potential revenue for July 2002-November 2002 is $216,736.00; the potential revenue for December 2002–September 2004 is $202,212.00." Id. (footnote omitted). This court first calculated the total potential revenue by taking the number of bedroom units identified in the HAP contract: sixty one bedroom units at $648.00; seventeen two

---

[6] Before calculating the lost profit damages, in Englewood V, this court noted that:

It is important to note that in its HAP contract damages claim Englewood is not asking the government to reimburse it for costs it incurred due to the breach, it is only asking for the HAP revenue it lost. From the record it is evident that Englewood had to pay additional costs out of pocket due to the breach of the HAP contract, although it had stopped receiving management fees. Expenses due to the breach appear to have been greater than those that would have been incurred absent the breach. Defendant is liable for damages it caused to plaintiff when it breached the HAP contract and cannot now avoid that obligation because plaintiff did not make payments to other third parties, arguably as a result of the lack of a HAP contract. As this award of HAP contract damages will not place plaintiff in a better position than it would have been without the breach, this court does not believe plaintiff's failure to deduct those expenses listed by the government should prevent plaintiff from recovery.

Englewood V, 94 Fed. Cl. at 128. The court concluded in Englewood V, therefore, "that Englewood can recover damages due to the breach of the HAP contract. Id. at 129.

bedroom units at $799.00; 140 two bedroom units at $727.00; six three bedroom units at $866.00; and eighty three bedroom units at $800.00, and then multiplied the contract rent to determine the total monthly rent:

| Number of Units | Number of Bedrooms | Contract Rent ($) | Total Monthly Rent ($) |
|---|---|---|---|
| 60 | 1 | 648.00 | 38,880.00 |
| 17 | 2 | 799.00 | 13,583.00 |
| 140 | 2 | 727.00 | 101,780.00 |
| 6 | 3 | 866.00 | 5,196.00 |
| 80 | 3 | 800.00 | 64,000.00 |
| | | | **223,439.00** |

Using the HAP contract, the court concluded that the potential rent revenue for each month, at 100% occupancy, was $223,439.00. See id. The court then determined what occupancy rate was appropriate for the July 2002 – November 2002 period and the December 2002 – September 2004 period. The court, recognized plaintiff's argument that Southe Pointe's historical vacancy rate had ranged from 1.3%–3%, and for the three previous years when Englewood had received the benefits of a HAP contract, the occupancy rate averaged 97.7%. Therefore, "the 97% rate of occupancy argued for by plaintiff was appropriate before plaintiff began substantial rehabilitation on South Pointe." Id. at 128. For the December 2002 – September 2004 period, the court recognized defendant's argument that "that construction on two floors of South Pointe, necessitated by the terms of the loan, would have occasioned at least a 9.4% vacancy," because South Pointe had twenty-one floors of units: twenty floors of apartments and one level of two-story townhouses, and nineteen floors occupied out of twenty-one equals 90.5% occupancy (19/21 = .9048). Therefore, the court concluded that, "from December 2002 (the month the loan was finalized) until the end of the contract, it should be assumed that two floors remained unoccupied (9.5% vacancy or 90.5% occupancy) for the purpose of calculating damages." Id. To determine the potential revenue for July 2002 – November 2002, the court multiplied the total potential revenue by the pre-loan occupancy rate ($223,439.00 x .97), for a total of $216,736.00, and to determine the potential revenue for December 2002—September 2004, the court multiplied the total potential revenue by the loan occupancy rate ($223,439.00 x .905), for a total of $202,212.00. The court concluded that the HAP contract damages were $3,272,217.00. See id. at 134. As noted above, the Federal Circuit affirmed both the dates of the damages period and the vacancy rate calculations. See Englewood VII, 479 F. App'x at 972.

The basis for the court's calculation was:

| Englewood's Lost HAP Revenue by Month | | | |
|---|---|---|---|
| Month | Potential Revenue | Actual Revenue[7] | Lost Revenue |
| October 2001 | $0.00 | $218,197.00 | $0.00 |
| November 2001 | $0.00 | $213,417.00 | $0.00 |
| December 2001 | $0.00 | $223,439.00 | $0.00 |
| January 2002 | $0.00 | $194,297.00 | $0.00 |
| February 2002 | $0.00 | $221,771.00 | $0.00 |
| March 2002 | $0.00 | $201,690.00 | $0.00 |
| April 2002 | $0.00 | $180,870.00 | $0.00 |
| May 2002 | $0.00 | $181,300.00 | $0.00 |
| June 2002 | $0.00 | $149,977.00 | $0.00 |
| July 2002 | $216,736.00 | $128,065.00 | $88,671.00 |
| August 2002 | $216,736.00 | $113,617.00 | $103,119.00 |
| September 2002 | $216,736.00 | $133,055.00 | $83,681.00 |
| October 2002 | $216,736.00 | $75,576.00 | $141,160.00 |
| November 2002 | $216,736.00 | $67,742.00 | $148,994.00 |
| December 2002 | $202,212.00 | $83,561.00 | $118,651.00 |
| January 2003 | $202,212.00 | $79,103.00 | $123,109.00 |
| February 2003 | $202,212.00 | $73,661.00 | $128,551.00 |
| March 2003 | $202,212.00 | $68,882.00 | $133,330.00 |
| April 2003 | $202,212.00 | $77,249.00 | $124,963.00 |
| May 2003 | $202,212.00 | $80,227.00 | $121,985.00 |
| June 2003 | $202,212.00 | $74,396.00 | $127,816.00 |
| July 2003 | $202,212.00 | $73,746.00 | $128,466.00 |
| August 2003 | $202,212.00 | $82,308.00 | $119,904.00 |
| September 2003 | $202,212.00 | $71,125.00 | $131,087.00 |
| October 2003 | $202,212.00 | $83,714.00 | $118,498.00 |
| November 2003 | $202,212.00 | $96,326.00 | $105,886.00 |
| December 2003 | $202,212.00 | $111,539.00 | $90,673.00 |
| January 2004 | $202,212.00 | $99,712.00 | $102,500.00 |
| February 2004 | $202,212.00 | $85,058.00 | $117,154.00 |
| March 2004 | $202,212.00 | $102,886.00 | $99,326.00 |
| April 2004 | $202,212.00 | $72,961.00 | $129,251.00 |
| May 2004 | $202,212.00 | $66,916.00 | $135,296.00 |
| June 2004 | $202,212.00 | $67,887.00 | $134,325.00 |
| July 2004 | $202,212.00 | $66,708.00 | $135,504.00 |
| August 2004 | $202,212.00 | $60,647.00 | $141,565.00 |
| September 2004 | $202,212.00 | $63,460.00 | $138,752.00 |
| | | Total | $3,272,217.00 |

---

[7] The defendant did not contest the Actual Revenue values.

8

A9

After trial, but before issuing the opinion in <u>Englewood V</u>, the court issued an Order on July 15, 2010 noting that for the CHAC vouchers, "neither party cites to primary source documents in the trial exhibits which support its date" for when the CHAC vouchers began to be issued to South Pointe residents. The court, therefore, ordered the parties to file a notice "stating whether the specific date the CHAC vouchers were issued can be found in the current exhibits and the trial testimony, and, if so, where this information can be located." In plaintiff's response, Mr. Samuelson cited to testimony and exhibits in the record he alleged supported his position, but did not request to reopen the record. It was not until after the court's opinion in <u>Englewood V</u> was issued that plaintiff sought reconsideration and requested that "the court permit a limited amount of additional testimony to be discovered on the narrow issue of the documentation of the dates on which the South Pointe vouchers were issued."

Following issuance of the trial court's opinion, in <u>Englewood VI</u>, the court reviewed plaintiff's motion for reconsideration of <u>Englewood V</u>, which plaintiff filed, partly as an attempt to reopen discovery, after plaintiff expressed disappointment with an award of only $3,272,217.00 in HAP contract damages for lost profits.[8] <u>See generally Englewood VI</u>, 96 Fed. Cl. 614. As this court wrote in <u>Englewood VI</u>:

> Plaintiff seeks to locate and supplement the record with CHAC vouchers in order to reassess the damages awarded. In <u>Englewood V</u>, the court awarded plaintiff $3,272,217.00 in HAP contract damages. HAP contract damages were assessed as a function of the issuance of vouchers to tenants, and the subsequent use or exercise of the vouchers. <u>See Englewood V</u>, 94 Fed. Cl. at 127. The plaintiff's HAP contract was phased out in stages. When a tenant exercised his or her voucher, Englewood stopped receiving HAP payments for that unit. In <u>Englewood V</u>, the court concluded that plaintiff was unable to cite to any exhibit in the record which would reliably inform the court of the specific date on which the vouchers were issued. Moreover, just because a tenant received a voucher did not mean that the voucher was immediately exercised, thereby impacting HAP payments to Englewood. <u>Id.</u>
>
> Plaintiff, unsatisfied with the $3,272,217.00 in HAP contract damages awarded by the court, <u>id.</u> at 134, effectively seeks to retry this case. Prior to trial, plaintiff was afforded the opportunity for discovery in support of its case, including damages. Plaintiff had multiple opportunities to introduce exhibits in support of damages at trial, and even to take advantage of a month-long break in the trial to locate additional documents supporting its damages claim. Moreover, after plaintiff rested and the trial record was

---

[8] The court notes that motions for reconsideration are not new to this case. After <u>Englewood I</u> was issued defendant filed a motion for reconsideration, which was denied. Likewise, plaintiff filed a motion for reconsideration after the court issued <u>Englewood III</u>, which was denied in <u>Englewood IV</u>. <u>See generally Englewood IV</u>, 86 Fed. Cl. 720.

closed, plaintiff was afforded the opportunity for post-trial briefing, and to identify evidence in the record and present arguments in support of its damages claims.

At trial, plaintiff attempted, through the testimony of Mr. Samuelson, to explain plaintiff's damages exhibits in support of its claim, including lost HAP contract revenues. Plaintiff also had opportunities to explain its argument that the calculation of lost HAP contract revenues should begin on October 1, 2001. The record contains plaintiff's chart titled "Englewood Lost HAP Revenue by Month (2001-2004)" in support of plaintiff's view of damages. During his testimony, Mr. Samuelson discussed voucher income, the issuance of housing vouchers, and declining HAP contract revenues. On January 27, 2007, after the close of the direct examination of Mr. Samuelson, plaintiff indicated there would be no witnesses for the plaintiff, other than Mr. Samuelson.

Defendant objected to the absence of supporting data for plaintiff's figures on HAP contract damages, and for a variety of reasons, and in an abundance of generosity, after presentation of the defendant's case, the court adjourned the trial for a month, during which time Mr. Samuelson was afforded an opportunity to gather his backup records in support of the damages summaries he had offered at trial. Mr. Samuelson was scheduled to retake the stand when the trial reconvened a month later, and if he was able to locate damages documentation, he could continue his direct testimony on damages, followed by defendant's cross-examination of Mr. Samuelson.

When the trial reconvened a month later, Mr. Samuelson was the sole witness to retake the stand for additional direct and cross-examination. Mr. Samuelson stated that he had found some documentation to support his lost HAP contract revenue summaries, but not the primary source CHAC vouchers. At this point, plaintiff offered the exhibits Mr. Samuelson had available into evidence, which were admitted without objection from the government. With the conclusion of Mr. Samuelson's additional testimony, both parties rested their cases, and the court closed the record. After the record was closed, the parties were afforded the opportunity to present closing arguments and to submit post-trial briefings. While the court was considering its damages opinion, Englewood V, the parties were directed to file a notice to the court, "stating whether the specific dates the CHAC vouchers were issued can be found in the current exhibits and the trial testimony and, if so, where this information can be located." Both parties responded in the negative.

Englewood VI, 96 Fed. Cl. at 620-21 (footnotes omitted).

10

A11

In its decision on appeal, the United States Court of Appeals for the Federal Circuit first found "no error" in this court's

> determination that HUD breached the 2000 HAP contract; that July 1, 2002, was an appropriate start of the damages period; that a 9.5% vacancy rate was appropriately used in the calculation of damages; that Englewood had not shown its entitlement to rent increases; that Englewood was not entitled to lost equity damages; and that Englewood was entitled to lost profits as a result of HUD's breach (if there were any lost profits).

Englewood VII, 479 F. App'x at 972. The Federal Circuit characterized the lost revenue as "gross revenue," noting that the Court of Federal Claims "awarded Englewood all of the gross revenue it would have received had HUD not breached the HAP contract without concurrently subtracting various costs or expenses that Englewood would have incurred absent breach." Id.

The Federal Circuit continued:

> HUD identified numerous costs saved by Englewood that it urged should have offset the lost profits damages received by Englewood. HUD asserts that if it had not breached the contract, Englewood would have had to repay the HUD-insured and IHDA loans that it took out in December 2002, along with the property taxes and liability insurance for South Pointe, which HUD argues Englewood did not pay during the breach period in 2003 and 2004. Moreover, HUD argues that had the contract not been breached, Englewood would also have been required to pay South Pointe's operating expenses and to expend money making repairs to South Pointe to maintain its compliance with HUD standards. The Claims Court made no findings as to the amount of costs saved by Englewood, but simply held that there was no need to deduct such costs from Englewood's rent revenue.

> The Claims Court erred by failing to deduct costs and expenses Englewood saved, i.e., did not pay, as a result of the breach. An award of gross revenues is not appropriate; this is not the measure of Englewood's loss from HUD's breach. By failing to deduct avoided costs, the Claims Court placed Englewood in a better position than it would have been in had there been no breach.

Id. at 972–73 (citations omitted). The Federal Circuit also indicated, "[t]here is, however, no identification or support for such expenses Englewood supposedly expended due to the breach in either the Claims Court's opinion or in Englewood's briefs before this court." Id. at 973.

The Federal Circuit stated that on remand, this court should "determine an appropriate reduction in the award to the plaintiff" and acknowledged that such "a

A12

reduction . . . could entirely eliminate the lost profits award." Id. The Federal Circuit concluded:

> The Claims Court must reduce the award by any operational costs or expenses Englewood did not pay but would have been obligated to pay if HUD had not breached the HAP contract. These may include mortgage payments, liability insurance, property taxes, and money for repairs and rehabilitation of South Pointe.

Id. at 973–74 (footnote omitted). The Federal Circuit noted, in regard to these costs and expenses, "[a]s HUD concedes, if Englewood retained legal obligations to repay these expenses they would not need to be deducted. But HUD contends that it already largely paid these costs itself." Id. at 973 n.2 (internal citation omitted).

After the remand, in compliance with the Federal Circuit's instructions, this court issued an order instructing the parties to prepare a detailed list of the expenses and costs Englewood would have been obligated to pay had HUD not breached the HAP contract. Plaintiff did not submit a list of costs avoided, but instead tried, once again, to reargue plaintiff's case stating that by "[a]pplying Judge Dyk's[9] logic to this case, Englewood should receive as damages the rental revenue it lost as a result of the HUD beach [sic] [gains prevented] and the extra expenses it incurred caused by the breach [losses caused], less savings resulting from the breach." (brackets in original). Defendant responded, and the court agrees, that the mandate from the Federal Circuit is limited to determining an appropriate deduction from the HAP breach damages award, and does not extend to a reassessment of the damages as a whole. Defendant submitted its proposed list of avoided costs and expenses, noting that it had previously argued for the deductions. See Englewood V, 94 Fed. Cl. at 128 ("Defendant argues that lost revenue calculations performed by the court must include deductions for expenses that the recovering party would have incurred. According to the government, the expenses which must be deducted include the money borrowed from IHDA, plus interest; the HUD-insured mortgage for 2003–2004; the liability insurance that Englewood did not pay in December 2003; the property taxes it missed in February 2004; and the amounts of money it would have needed to complete the rehabilitation . . . ."); see also Englewood VII, 479 F. App'x at 972 ("HUD asserts that if it had not breached the contract, Englewood would have had to repay the HUD-insured and IHDA loans that it took out in December 2002, along with the property taxes and liability insurance for South Pointe, which HUD argues Englewood did not pay during the breach period in 2003 and 2004. Moreover, HUD argues that had the contract not been breached, Englewood would also have been required to pay South Pointe's operating expenses and to expend money making repairs to South Pointe to maintain its compliance with HUD standards.").

_____

[9] Judge Dyk was the author of the Englewood VII opinion issued by the United States Court of Appeals for the Federal Circuit.

In light of the Federal Circuit's specific instructions to only address the amount of any reduction from the $3,272,217.00 damages award for lost profits, this court held a hearing after the remand and subsequently received briefs from the parties. Plaintiff elected not to submit its own list of expense categories to be review, but instead adopted the list of expense categories to be reviewed which was submitted by defendant in defendant's response to plaintiff's opening brief on remand.[10] The categories of expenses and costs which the parties agreed to address as plaintiff's potential avoided costs, absent the breach, was as follows: the Community Investment Corporation (CIC) debt service for the period July 1, 2002 to March 1, 2003; the CIC balloon payment at maturity as of March 1, 2003; the Michigan National Bank loan debt; major repairs to South Pointe, estimated at $3,514,568.00; other routine operating expenses at South Pointe, estimated at $1,830,993.00; real estate taxes estimated in the amount of $250,000.00; insurance payments estimated in the amount of $120,000.00; and the Reilly Mortgage interest payments in the amount of $618,232.00 for interest during construction, and $430,768.08 for principal and interest payments post-construction.

This court also issued an Order allowing for one final opportunity to supplement the record. The Order stated that, "the previously closed trial record will be reopened for the limited purpose of adding limited, additional documents to the record." The court ordered the parties to work together, and instructed the defendant to file "a copy of the closing transcript, the draws of disbursements, and any additional relevant documents which can inform the court regarding plaintiff's operational costs or expenses, as discussed and agreed to at the November 19, 2012 hearing."[11] The court's Order confirmed the understanding to which both parties agreed: "At the hearing, the parties

---

[10] In plaintiff's response to defendant's opening brief on remand, plaintiff listed a series of bullet points describing "What is the 'Plausible "But-For" World' That Englewood Would Have Experienced by [sic] If HUD Had Not Breached the 2000 HAP Contract?" Plaintiff stated: "Englewood would have been eligible for a rental increase in October 2000," "Englewood would have been eligible for the $139K energy reimbursement funding in September 2001," "Englewood would not have to create and pay for a marketing plan and staff from October 2001 through May 2004," "Englewood would not have to create and pay for a resident relocation plan and staff from November 2001 through November 2002," and "Englewood would not have had to create and pay for a team of residents to 'trash out' the garbage, furniture and other debris left in units by tenants who took their vouchers and left." Despite the Federal Circuit's instructions, and this court's Order, plaintiff did not include any operational costs or expenses Englewood did not have to pay, but would have been obligated to pay, but for the breach.

[11] This was the fourth time the court re-opened the record to allow plaintiff to prove its breach damages with specificity. Given the numerous opportunities to complete the record, the court also noted that "[a]fter the additional documents are included in the record, the record shall be closed, and the court will not entertain motions to reopen the record further."

A14

agreed to use the list of relevant categories on page 3 of the defendant's October 5, 2012 brief, on the type of expenses Englewood did, or did not, pay." The parties were ordered in their subsequent briefing to use this list of categories of expenses and identify, "with as much specificity as possible," how much each category of expenses impacted the $3,272,217.00 damages award. Additional documents were submitted and added to the record as exhibits on January 31, 2013 and on February 13, 2013, after which the parties filed a joint status report agreeing that the record was now complete. Between the two filings, almost 2,000 pages were added to the record.

Plaintiff alleges in the briefs submitted to the court after the remand that for each of the categories in the agreed-upon list of expenses, plaintiff either "had no obligation to pay the claimed expense," plaintiff "paid the expense," or plaintiff "retained the legal obligation to repay expenses paid by a third party (i.e. Reilly Mortgage)." Specifically, plaintiff alleges that the entire loan balances for the CIC and Michigan National loans were paid on December 13, 2002, using funds from the Reilly Mortgage loan; that plaintiff had no obligation to make major repairs on South Pointe; and that, in 2003 and 2004, plaintiff used advances from the Reilly Mortgage loan to pay operating expenses, real estate taxes, and insurance payments. Plaintiff asserts that when it received advances from Reilly Mortgage, it was as if Englewood had paid those expense, as Englewood had a legal obligation to repay those advances. Plaintiff concludes "that there should be no deductions from this Court's previous damages award."

Defendant, in its submissions to the court, argues that plaintiff's damages award "should be eliminated or at least reduced significantly." According to defendant, plaintiff "was not damaged because: 1) Englewood's debts were merely re-characterized into the new $11.6 million dollar, HUD-insured mortgage; and, 2) Englewood never made payments on that mortgage; and, 3) HUD paid an insured claim for the entire mortgage and only recovered 20 cents on the dollar when it was sold; and, 4) the Reilly Mortgage was foreclosed; and, 5) Englewood is no longer liable for the mortgage or deficiency because the mortgage note was non-recourse." (internal citations omitted). Defendant also argues that, even if plaintiff can recover damages for expenses paid with the HUD-insured loan, plaintiff has failed to provide evidence that it paid all of the expenses the parties agreed must be addressed.

### DISCUSSION

In remanding the above captioned case to this court, the United States Court of Appeals for the Federal Circuit has articulated a variety of related standards to determine damages in a breach situation. In Englewood VII, the Federal Circuit stated that, "[a]s a matter of general contract law, an injured party can collect as expectancy damages, i.e., lost profits, 'the loss in value to him of the other party's performance caused by its failure or deficiency, . . . less . . . any cost or other loss that he has avoided by not having to perform.'" Englewood VII, 479 F. App'x at 973 (quoting Restatement (Second) of Contracts § 347 (1981)) (omissions in original). The Federal Circuit in Englewood VII also cited the dissenting opinion in Rumsfeld v. Applied Companies, Inc., 325 F.3d 1328 (Fed. Cir.), cert. denied, 540 U.S. 981 (2003), noting:

14

"""[C]ompensatory damages will be given for the net amount of the losses caused and gains prevented, in excess of savings made possible.""" Id. at 1344 (Dyk, J., dissenting in part) (quoting Restatement (First) of Contracts § 329 cmt. A (1932)). To derive the proper amount for an award of damages, in Englewood V, this court cited to the quotation in Bluebonnet Savings Bank, F.S.B. v. United States, 339 F.3d 1341 (Fed. Cir. 2003), that "the costs resulting from the breach must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach." Id. at 1345.

As explained by the Federal Circuit in Anchor Savings Bank, FSB v. United States:

> Damages for breach of contract are designed to make the non-breaching party whole. One way to accomplish that objective is to award "expectancy damages," i.e., the benefits the non-breaching party would have expected to receive had the breach not occurred. Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001). Expectancy damages "are often equated with lost profits, although they can include other damage elements as well." Id. To recover lost profits for breach of contract, the plaintiff must establish by a preponderance of the evidence that (1) the lost profits were reasonably foreseeable or actually foreseen by the breaching party at the time of contracting; (2) the loss of profits was caused by the breach; and (3) the amount of the lost profits has been established with reasonable certainty. Cal. Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005); Energy Capital Corp. v. United States, 302 F.3d 1314, 1324–25 (Fed. Cir. 2002).

Anchor Savings Bank, FSB v. United States, 597 F.3d 1356, 1361 (Fed. Cir. 2010). Although a non-breaching party is entitled to an award of damages that would restore the party to the position it would have been in had the contract been performed, the non-breaching party should not be awarded damages that put the party in a better position than it would have been in if the contract had not been breached. See Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d at 1345 (quoting Mass. Bay Transp. Auth. v. United States, 129 F.3d 1226, 1232 (Fed. Cir. 1997)) ("One of the basic principles of contract damages is that 'damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation.' Thus, the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach."); see also White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002); Restatement (Second) of Contracts § 344(a) (1981).

In order for lost profits to be recoverable, "they must flow from the contract that is the subject of the lawsuit and not from 'independent and collateral undertakings.'" Precision Pine & Timber, Inc. v. United States, 72 Fed. Cl. 460, 471 (2006) (quoting Energy Capital Corp v. United States, 302 F.3d 1314, 1328 (Fed. Cir. 2002)), on recons., 81 Fed. Cl. 235 (2007), recons. in part, 81 Fed. Cl. 733 (2008), aff'd in part, rev'd in part and remanded, 596 F.3d 817 (Fed. Cir. 2010). Similarly, when considering

15

A16

expenses a plaintiff saved, or did not pay, as a result of the breach, the savings, as a form of offset, should be "limited to actions reasonably directly related to the breach and its proximate consequences." LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1366 (Fed. Cir. 2003); see also Am. Fed. Bank, FSB v. United States, 72 Fed. Cl. 586, 610 ("The court then must offset any costs avoided or benefits received as a consequence of the breach.") recons. denied, 74 Fed. Cl. 208 (2006), aff'd, 295 F. App'x 368 (Fed. Cir. 2008); Tenn. Valley Auth. v. United States, 69 Fed. Cl. 515, 543 (2006) ("In Indiana Michigan [Power Co. v. United States, 422 F.3d 1369, 1373 (2005)], the Federal Circuit expressly limited recoverable damages to those that can be 'shown with reasonable certainty.' . . . Correlatively, the 'benefits' the government seeks to setoff are too speculative to meet the standards set forth by the Federal Circuit in Indiana Michigan, and thus a setoff is denied."); Bluebonnet Sav. Bank, F.S.B. v. United States, 67 Fed. Cl. 231, 236–37 (2005) ("[O]ffsets typically included losses that the plaintiff would have incurred had the contract been performed . . . ."), aff'd, 466 F.3d 1349 (Fed. Cir. 2006). Costs and expenses which the non-breaching party would have incurred in both the breach and non-breach world should not be deducted, as those costs were not "saved" or avoided by the breach. See, e.g., Sure-Trip, Inc. v. Westinghouse Eng'g, 47 F.3d 526, 531 (2d Cir. 1995) (citations omitted) ("Fixed overhead costs, as opposed to variable costs, are not properly deducted in calculating plaintiff's lost profits . . . . Fixed costs represent the total dollar expense that occurs regardless of output.").

Avoided costs and expenses are part of the "but-for" world of lost profits, which plaintiff must establish with reasonable certainty. See S. Nuclear Operating Co. v. United States, 637 F.3d 1297, 1304 (Fed. Cir. 2011) (Noting that the burden to establish a but-for world, "with respect to both claimed costs and avoided costs, plaintiffs bear the burden of persuasion," and "this burden extends to avoided costs . . . ."). This court employed a substantial factor test in determining HAP contract damages, Englewood V, 94 Fed. Cl. at 124. "'Because plaintiffs . . . are seeking expectancy damages, it is incumbent upon them to establish a plausible "but-for" world.'" S. Nuclear Operating Co. v. United States, 637 F.3d at 1304 (quoting Yankee Atomic Elec. Co. v. United States, 536 F.3d 1268, 1273 (Fed. Cir. 2008)) (alteration in original); see also Stockton E. Water District v. United States, 109 Fed. Cl. 760, 781 (2013) ("Regardless of the causation standard applied, the Federal Circuit has held that it is incumbent upon [a plaintiff seeking expectancy damages] to establish a plausible 'but-for' world." (brackets in original; internal quotations omitted;); Sacramento Mun. Util. District v. United States, 109 Fed. Cl. 660, 682 (2013); Bluebonnet Savings Bank F.S.B. v. United States, 67 Fed. Cl. at 238 ("[B]ecause plaintiffs in this case are seeking expectancy damages, it is incumbent upon them to establish a plausible 'but-for' world."). In Southern Nuclear Operating Co. v. United States, the Federal Circuit explained that the "'party incurring the relevant costs is in the best position to adduce and establish such proof,'" S. Nuclear Operating Co. v. United States, 637 F.3d at 1304 (quoting 11 Arthur L. Corbin & Joseph M. Perillo, Corbin on Contracts § 57.10 n.15 (rev. ed. 2005)), and the "plaintiffs are in the best position to determine both the costs they would have incurred and the costs they would have avoided," although a defendant may be called upon to "point[] out the costs it believes the plaintiff avoided because of its breach." Id. (citing Mech-Con Corp. v. West, 61 F.3d 883, 886 (Fed. Cir. 1995); 11 Corbin on Contracts §

16

57.10). Even if defendant contributes to the determination of avoided costs, however, plaintiff ultimately bears "the burden of demonstrating 'what might have been.'" Bluebonnet Savings Bank F.S.B. v. United States, 67 Fed. Cl. at 238 (quoting Glendale Fed. Bank FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001)).

As noted above, the Federal Circuit directed that on remand this court should reduce the lost profit award "by any operational costs or expenses Englewood did not pay but would have been obligated to pay if HUD had not breached the HAP contract." Englewood VII, 479 F. App'x at 973. A corollary of the Federal Circuit's mandate is that, in seeking expectation damages, if plaintiff does not establish the "but-for" world, plaintiff will be unable to recover its expectation damages. In Glendale Federal Bank, FSB v. United States, the Federal Circuit acknowledged that, "[t]he problems of proof attendant on the burden placed on the non-breaching party of establishing lost profits— on establishing what might have been—are well recognized. Even with a generous standard of proof applied in such cases, see, e.g., San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir.), reh'g denied (Fed. Cir. 1997); Neely v. United States, 152 Ct. Cl. 137, 285 F.2d 438, 443 (1961), the proof problems can in some situations prove to be insurmountable." Glendale Fed. Bank, FSB v. United States, 239 F.3d at 1380. If plaintiff is unable to establish evidence of costs it would have been obligated to pay in a "but for" world, the court will not be able to assess plaintiff's damages award. See Kansas Gas and Elec. Co. v. United States, 685 F.3d 1361, 1371 (Fed. Cir. 2012) ("Without record evidence about the research costs in both worlds, the trial court could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the damages . . . . Thus, the Court of Federal Claims did not err in disallowing damages . . . ."); see also Stockton E. Water District v. United States, 109 Fed. Cl. 460, 494 (2013) (finding that plaintiff was not entitled to expectancy damages because plaintiff had failed to establish evidence of the "but-for" world); Yankee Atomic Elec. v. United States, 536 F.3d at 1273 ("Without record evidence about the Yankees' condition with full Government performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the Yankees' damages.").

This court has given the plaintiff at least four separate opportunities, over many years, to gather and submit to the court documentation that would establish its claims (during discovery prior to trial, during the suspension of trial when Mr. Samuelson's testimony was deferred so that he could search for and provide further evidence, prior to issuing Englewood V, and now after the case was remanded to this court by the Federal Circuit). The court continued to give plaintiff these opportunities because the court found that HUD had breached the HAP contract and that plaintiff was entitled to damages resulting from that breach. See Englewood V, 94 Fed. Cl. at 134. As was demonstrated to this court by plaintiff throughout the pre-trial, trial, and post-trial proceedings, plaintiff's record-keeping, retention, and presentation has been limited, scattered and disorganized, despite the numerous opportunities provided by the court to bring plaintiff's evidence together in a proper evidentiary form for presentation in this court.

17

A18

Plaintiff must establish a plausible "but-for" world, or in other words, a world in which HUD honored the original HAP contract through September 30, 2004. On remand, in accordance with the Federal's Circuit's instructions, the court's consideration is limited to reviewing "any operational costs or expenses Englewood did not pay but would have been obligated to pay" if HUD had not breached the HAP contract in the "but for" world. <u>Englewood VII</u>, 479 F. App'x at 974. The Federal Circuit indicated that the operational costs or expenses may include mortgage payments, liability insurance, property taxes, and money for repairs and rehabilitation of South Pointe. The Federal Circuit noted, in regard to these costs and expenses, "[a]s HUD concedes, if Englewood retained legal obligations to repay these expenses they would not need to be deducted. But HUD contends that it already largely paid these costs itself." <u>Id.</u> at 973 n.2 (internal citation omitted). As more fully explained in its brief before the Federal Circuit the government stated:

> In the Government's initial brief, we noted that HUD had already paid the expenses that Englewood would have used the HAP contract revenue to pay, because HUD as the mortgage insurer had to repay the lender when Englewood defaulted on its loan. This included the mortgage principal, the mortgage interest, the advanced property taxes, and the advanced insurance. HUD, therefore, has already paid the expenses for South Pointe that Englewood would have needed to pay to gain the benefits of the HAP contract in 2002, 2003, and 2004.

> Englewood ignores this point, because it has no defense to it. Instead, Englewood poses a hypothetical, stating that B's failure to pay X and Z does not relieve A of its obligation to pay B. This would make sense, if B retained legal obligations to repay X and Z, as B would not have escaped any payments as a result of the default. However, Englewood's hypothetical ignores that it did escape the obligation to pay X and Z, obligations it would have needed to incur to obtain the benefits of the HAP contract. In this case, A (HUD) satisfied the obligations of B (Englewood) to X (Reilly Mortgage, the HUD-insured mortgagee).

> Thanks to HUD's payments, Englewood avoided the costs of making the mortgage payments, as well as the property tax and insurance payments, and faced no liability from those creditors. Englewood, therefore, avoided the payments it would have needed to make to keep receiving the monthly HAP revenue in 2002, 2003, and 2004, and will not be sued by the creditors.

(internal citations omitted).

Because the parties agreed to the list of eight expense categories to be reviewed, the court specifically addresses those costs as they pertain to calculating the appropriate reduction, if any, of the damages award, in light of the United States Court

18

A19

of Appeals for the Federal Circuit's instructions on remand. As indicated above, the eight categories are the CIC debt service from July 1, 2002 to March 1, 2003; the CIC balloon payment at maturity as of March 1, 2003; the Michigan National Bank loan debt; major repairs to South Pointe, estimated at $3,514,568.00; routine operating expenses at South Pointe estimated at $1,830,993.00; real estate taxes estimated in the amount of $250,000.00; insurance payments estimated in the amount of $120,000.00; and the Reilly Mortgage interest payments, payments estimated in the amount of $618,232 for interest during construction, and $430,768.08 for principal and interest payments post-construction.[12]

Six of the eight categories—the CIC debt service, the CIC balloon payment, the Michigan National loan debt, the real estate taxes, the insurance payments, and the Reilly Mortgage interest payments—were expenses that the parties agree were paid in their entirety by the Reilly Mortgage loan. This court previously determined in Englewood V that the HUD-insured Reilly Mortgage loan was a separate transaction from the HAP contract. In Englewood V, this court stated that "[t]he record reflects Englewood had been attempting to obtain a section 221(d)(4) loan insured by HUD for the purpose of performing substantial rehabilitation since 1999," as Englewood had applied for a HUD-insured loan in 1999, twice in 2001, and again in 2002. Englewood V, 94 Fed. Cl. at 128. Furthermore, this court found in its analysis of Englewood's claim of lost equity that "attempts to connect the foreclosure of the [HUD-insured] loan to the breach of the HAP contract are far too speculative." Id. at 133. Regarding the damages calculations, defendant argued that there were "numerous other methods by which Englewood was predestined to lose South Pointe, regardless of the status of the HAP contract." In Englewood V, this court stated that "taking out the $11.6 million loan which Englewood used to rehabilitate South Pointe, a property which it eventually lost due to foreclosure of the same loan, did not place Englewood in a better position than it would have been with the continuation of the HAP contract." Id. at 129. It, therefore, is possible that the payments tied directly to the HUD-insured Reilly Mortgage loan, such as the interest on the Reilly Mortgage loan itself, should not be deducted from plaintiff's damages award. Plaintiff, however, has failed to produce sufficient, reliable evidence to demonstrate that Englewood did, in fact, make payments on any of these expenses or on the Reilly Mortgage loan.

The CIC debt service and the CIC balloon payment have been consolidated into one category by the parties, as the entire CIC loan was paid by the HUD-insured Reilly Mortgage on December 13, 2002. Defendant originally suggested that the CIC loan debt service would have been approximately $600,000.00 from July 1, 2002 to March 1,

---

[12] Although the Federal Circuit noted defendant's assertions on appeal that, "if it had not breached the contract, Englewood would have had to repay the HUD-insured and IHDA loans that it took out in December 2002, along with the property taxes and liability insurance for South Pointe," as well as the operating expenses and repairs, Englewood VII, 479 F. App'x at 972, the Federal Circuit "made "no determination as to which of these items should be deducted, leaving that determination to the Claims Court in the first instance." Id. at 974.

19

2003, based on the debt service for 2001, and that the balloon payment "would likely have been at least $1,559,278.88 plus accrued interest, late charges and fees." After the closing documents from the Reilly Mortgage were entered into the record, defendant noted that "[t]he payoff amount to CIC was in fact $1,743,293.49 in December 2002."

After the parties stipulated that "the record for the remand proceedings now is complete and that record is now closed," and after reviewing defendant's initial filings on remand, plaintiff again asserts that it paid the "entire [CIC] loan balance on December 13, 2002, plus accrued interest, late charges and fees, a total of $1,743,293.49." Plaintiff further asserts that the "evidence of plaintiff's satisfaction of this obligation" is the December 9, 2002 payoff letter from CIC, the loan closing statement reflecting the total payment, and the "Owner's Sworn Statement." Plaintiff argues that "[s]ince plaintiff paid off the CIC loan . . . there was no loan balance due CIC," and that "[b]y paying off all of its obligations to CIC on December 13, 2002, Englewood had no further obligation to make interest payments to CIC from December 13, 2002 to March 1, 2003." By contrast, defendant argues that "the CIC note was scheduled to mature on March 1, 2003. Accordingly, Englewood would have had to pay the entire balloon balance owed on the CIC mortgage note during the damages period." (internal citations omitted).

Similarly, both parties agree that the Michigan National loan was paid in full on December 13, 2002, at the closing of the Reilly Mortgage loan. The record now contains a payoff letter from Standard Federal[13] on December 10, 2002, the loan closing statement reflecting payment of $765,237.56 to Standard Federal, and the "Owner's Sworn Statement," also showing the payment of $765,237.56. Plaintiff, however, argues that "[s]ince plaintiff paid off this loan, there was no loan balance due Standard Federal, and there should be no deduction of this amount from the plaintiff's damages award." Defendant argues, however, that the debt was paid by funds from the Reilly Mortgage loan, and not by Englewood, and, therefore, should be deducted from the damages award.

In addition to the payment of the CIC and Michigan National loans, the record reflects that past due real estate taxes in the amount of $120,567.99 were paid as part of the closing of the Reilly Mortgage loan, with an additional $250,000.00 allocated for taxes during construction, which was used to pay real estate taxes in 2003. Reilly Mortgage also advanced $129,628.00 to pay real estate taxes in February 2004. Defendant, therefore, argues that a total of $500,195.99 for real estate taxes should be deducted from plaintiff's damages award. Plaintiff again argues that "Englewood remained liable for the advances that Reilly made for real estate taxes in 2004 . . . . Therefore, there is no basis for deducting any costs for real estate payments from Englewood's damages award." Plaintiff further argues that the funds advanced by Reilly Mortgage to pay the real estate taxes were part of $750,000.00 provided by

---

[13] Defendant indicated that Michigan National Bank merged with Standard Federal Bank in late 2001, which accounts for the discrepancy in the junior-mortgage holder being Standard Federal, instead of Michigan National, in the Reilly Mortgage closing documents.

Englewood to the mortgage, however, the Loan Closing Statement shows that $750,000.00 was not a contribution Englewood made directly to Reilly Mortgage, but was the amount loaned by IHDA. The record also shows that insurance payments for 2003 were made by funds advanced by Reilly Mortgage in the amount of $154,579.00. Additional funds in the amount of $87,082.03 were advanced to pay insurance through December 2004. Plaintiff argues that Englewood paid $241,661.03 in insurance expenses through Reilly Mortgage, and there should not be any deduction from the damages related to insurance payments. Defendant, however, argues that the total amount of insurance payments made by funds advanced from Reilly Mortgage, $241,661.03, should be deducted from the plaintiff's damages award.

Finally, the parties addressed the interest due on the Reilly Mortgage loan, which was paid by advances from Reilly Mortgage. Defendant argues that Englewood failed to introduce evidence that it paid "Reilly Mortgage interest payments amounting to $618,232 for interest during construction, and $430,768.08 for principal and interest payments post-construction." (internal citations omitted). Plaintiff responds that "Englewood made $556,205 in construction period interest payments by the end of April 2004," and acknowledges that "[i]t had borrowed $618,232 to make these payments," as part of the financial requirements for closing. Plaintiff further alleges that "there was $62,027[14] left in the construction period interest account when Reilly assumed control of the property the week of May 21, 2004." Regarding the $430,768.08 for principal and interest payments on the Reilly Mortgage loan after the completion of construction, plaintiff argues that, per the "Commitment for Insurance Advances," payment on the principal "would not begin until the fourth month following the completion of construction." Plaintiff argues that, at most, there would have been interest payments made from May through September 2004, amounting to approximately $217,276.00,[15] but also argues that "since Englewood remained legally liable for the payment of proper

---

[14] Although the difference between the $618,232.00 that plaintiff claims was part of the financial requirements for closing and the $556,205.00 paid in interest by May 2004 is $62,027.00, on a page later, in the same section of plaintiff's brief, plaintiff states that, "Englewood had disbursed $556,205 in construction period interest by the end of April 2004 . . . . There was $62,066 in construction period interest left in the loan as of April 30, 2004."

[15] Plaintiff arrives at this number by using the April 2004 interest payment of $56,627.00 for July 2004, August 2004, and September 2004, plus the accrued interest for May and June 2004 as stated in "Englewood's Answer and Defenses to Plaintiff Mortgagee's First Amended Complaint," less the amount plaintiff claims was still available in its capitalized interest account, $62,007.00. Although plaintiff cites to "Englewood's Answer and Defenses to Plaintiff Mortgagee's First Amended Verified Complaint," filed in the Chancery Division of the Circuit Court of Cook County, Illinois on October 12, 2005 to establish that interest for May and June 2004 was $109,401.70, in Englewood's Answer, plaintiff also states that "Englewood does not have sufficient information to either admit or deny . . . that the accrued interest was $109,401.70."

21

A22

post-construction interest charges, . . . these costs should not be deductions from Englewood's damages award."  In response, defendant notes that "[t]he problem of course is that Englewood is not responsible for the Reilly Mortgage (it defaulted on the mortgage) and HUD insured Reilly for Englewood's default. Englewood's obligations were effectively 'waived or given away or didn't come into being' because HUD paid those debts.  By ignoring this in its damages calculations, Englewood asks the Court to compel the Government to pay again. Thus, requiring the Government to reimburse Englewood for this alleged debt would put Englewood in a better position than it would have been in had there been no breach." (internal citations omitted).

The total amount of costs defendant claims plaintiff avoided because the expenses were paid solely by funds advanced from Reilly Mortgage is $4,299,388.15, or more than the entire amount of the damages award.[16]  Plaintiff asserts that none of the categories paid by funds from the Reilly Mortgage loan should be deducted from plaintiff's damages awards because plaintiff "paid" those expenses, as it remained legally obligated to repay the mortgage during the damages period from July 2002 to September 30, 2004.  For each category that was paid in full by funds from Reilly Mortgage loan, plaintiff argues that Englewood paid that obligation through funds advanced by Reilly Mortgage.  As indicated above, however, to establish a "but-for" world of avoided costs, plaintiff must provide proof that Englewood either paid the expenses itself, or made payments to Reilly Mortgage.  Although plaintiff has presented records of expenses in the form of Englewood's general ledgers, there are no entries or other reliable documents indicating that Englewood made payments to Reilly Mortgage.[17]

In addition to the categories of expenses paid entirely by funds from the Reilly Mortgage loan, the parties agreed to address plaintiff's obligation to pay for major repairs to South Pointe and other operating expenses.  Defendant argues that, "[a]ny plausible 'but for' scenario must also consider the physical condition that South Pointe was in, and that major repairs over and above the routine operational costs were needed."  Defendant offers a long list of needed repairs culled from a February 28, 2002 property condition report prepared by the Kennedy Group, the 2000 plans of Englewood's own architect, a March 19, 2001 letter from IHDA, and a 2001 review of

---

[16] The final CIC payment was $1,743,293.49.  The payoff of the Standard Federal loan was $765,237.56. A total of $500,195.99 was paid for real estate taxes, and $241,661.03 for insurance.  Finally, funds were borrowed to make the Reilly Mortgage loan interest payments in the amount of $618,232.00, and defendant argues that an additional $430,768.08 would have been due in principal and interest payments after construction was completed.

[17] Plaintiff references Englewood's general ledgers for the years 2002, 2003, and 2004 as evidence of its expenses.  Defendant argues that "Englewood did not use these ledgers to prove it paid its expenses at trial, assuredly knowing that we would not consent to using the ledgers for this purpose because Englewood never produced underlying documents to show that expenses were in fact paid."

22

the property by Mr. Samuelson. Defendant states that the dollar amount defendant quotes comes from "Englewood's own analysis, which determined that South Pointe needed $3,514,568.00 to complete repairs or replacements of the roof, the mechanical penthouse, the exterior walls, and the individual units." Defendant argues that, at a minimum, plaintiff would have been required to complete repairs to respond to code violations or requirements of other governmental authorities, such as the city of Chicago or IDHA. Using the estimates of plaintiff's architect in the record, defendant lists roof replacement, plumbing repairs, garbage chute doors, and installation of smoke detectors, for a total of $503,152.00. Defendant additionally notes, citing from the record, that elevator repair also was needed, at an estimated cost of $155,520.00. Defendant, therefore, concludes that plaintiff would have been obligated to make repairs totaling at least $658,672.00. Moreover, even if plaintiff was not obligated to make major repairs to South Pointe, defendant argues that, "[i]n any plausible 'but for' world, Englewood would have been required to maintain South Pointe in decent, safe and sanitary condition to avoid breaching the terms of its HAP contract with HUD . . . . Englewood would need to incur routine operating expenses, such as for utilities, management, security, eviction and other legal fees, elevator maintenance, permits, and repairs."

Plaintiff responds that it was under no obligation to pay for major repairs in the amount of $3,514,568.00 as suggested by defendant, alleging that the dollar amount originated in an August 6, 2001 letter outlining a "feasibility analysis" of HUD's proposed rehabilitation of South Pointe. Plaintiff asserts that this was "one brief phrase in one sentence in a six page memo covering 9 topics of discussion and 14 exhibits." Plaintiff further asserts that there was neither a contract, nor an obligation for Englewood to complete the approximately $3.5 million in major repairs. Plaintiff does, however, concede that it was required "to repair or replace 36% of the stoves" by the March 8, 2002 REAC report. Plaintiff also indicates that there were "chronic needs at South Pointe" that required attention, often in response to inspections conducted by REAC, IHDA, and Chicago Housing Authority, but claims "[a]ll of these were maintenance items," and distinguishes these from "capital repairs." Under the HAP contract, plaintiff argues that Englewood was only required to keep South Pointe "'decent, safe, and sanitary,' and in compliance with REAC inspections," but plaintiff offers no evidence or documentation of what repairs were made by Englewood during the damages period.

Plaintiff argues not only that all operating expenses were paid by Englewood during the breach, but despite the fact that occupancy was declining, "[a]ll of the basic costs — gas, electricity, water, grounds, elevator, security, maintenance, janitorial services, exterminating, administration, etc. — were the same as if the building was fully occupied." Therefore, plaintiff argues that Englewood did not save any expenses from the breach. Plaintiff refers to entries in Englewood's general ledger to prove payments were made by Englewood in 2002, 2003, and 2004. Plaintiff additionally argues that it had "five sources of funding available to plaintiff to pay for program operations, including the increased [sic] in operating costs caused by HUD's breach. They were: (1) rental payments by residents paying market rate rents; (2) HAP payments from October 2001 through September 2002; (3) voucher payments from CHAC from October 2001 through

May 25, 2004; (4) partnership contributions from October 2001 through May 25, 2004; and (5) funds borrowed by Englewood from the Illinois Housing Development Authority." Although plaintiff's general ledgers reflect as entries: "rent collection," HAP subsidies, and CHAC payments, defendant argues that the "general ledgers were used for the limited purpose of backing up its revenue figures," and that "the Government has not consented to their use to reflect payment." Defendant also argues that "Englewood did not use these ledgers to prove it paid its expenses at trial, assuredly knowing that we [defendant] would not consent to using the ledgers for this purpose because Englewood never produced underlying documents to show that expenses were in fact paid."[18] Plaintiff represents that the general ledgers entered into evidence demonstrate that Englewood paid $681,332.00 in operating expenses from July 2002 through December 2002; $1,282,043.00 in 2003; and $740,112.00 in expenses from January through September 30, 2004. Although plaintiff repeatedly states that operating expenses were paid by rental income, plaintiff acknowledges that some payments were made through advances from the Reilly Mortgage loan, specifically a gas payment of $98,500.00 on April 20, 2004 and payroll in the amount of $20,000.00 in May 2004.

For each category of expenses the parties agreed to address, the CIC loan debt service and balloon payment, the Michigan National loan, real estate taxes, insurance payments, interest and principal payments on the Reilly Mortgage loan, major repairs to South Pointe, and operating expenses, the evidence in the record establishes that various payments were made, not by Englewood, but by funds advanced by Reilly Mortgage or the IHDA. When plaintiff did make a payment, there has been no documentation offered, other than Englewood's summary, general ledgers, which, incidentally, reflect deposits from the IHDA in addition to rental, HAP, and CHAC income, and Mr. Samuelson's broad testimony at trial. Defendant appears to be correct when it asserts that "Englewood offered, at best, inadequate evidence that it paid any of its obligations. This fact alone should bar the award of any damages." (emphasis in original).

As noted in a number of decisions issued by this court regarding plaintiff's case, this court affirmatively believes HUD was in the wrong when it breached the HAP contract and agrees with plaintiff that it continued to incur certain expenses. Nonetheless, plaintiff's repeated failure to keep, locate, and submit to the court adequate records has been a consistent problem throughout the above-captioned case, despite numerous opportunities accorded to plaintiff to identify and offer specific documentation, including now on remand. Even plaintiff's offered "best evidence" to prove its expenses, the general ledgers from 2002, 2003, and 2004, reflect the inadequacy of plaintiff's records. Although at trial Mr. Samuelson explained that the general ledgers were "the normal way in which we kept our records," and in the general ledgers he had "found . . . the backup documentation that supported all the revenue

---

[18] In addition to plaintiff not providing the underlying documents to the general ledgers to demonstrate any expenses, line descriptions within the general ledgers are inconsistent, as reflected in the example included below, making it difficult to identify the various funding sources.

numbers," the ledgers alone are not sufficient documentation. In its remand brief, defendant correctly asserts, "[a]s Englewood admits, its general ledgers were used for the limited purpose of backing up its revenue figures." Moreover, defendant states, "the Government has not consented to their use to reflect payment." Defendant also notes: "Englewood did not use these ledgers to prove it paid its expenses at trial, assuredly knowing that we would not consent to using the ledgers for this purpose because Englewood never produced underlying documents to show that expenses were in fact paid."

Defendant further states:

[N]ow five years after trial, Englewood wishes to use the general ledgers to fill the void caused by its failure to produce evidence regarding its expenses. At bottom, the general ledgers are insufficient to establish actual expenses for South Pointe because they are only a partial record of the project's full general ledger, and there was no testimony at trial explaining any entries regarding the purported expenses. They do not prove that Englewood paid the expenses cited in the Government's brief; in fact, in terms of credibility of the record itself, PX 13, PX 15 and PX 17 [the general ledgers] were generated in March 2006, years after the actual purported entries.

(internal citations omitted). Defendant is correct that the plaintiff trial exhibits for the general ledger were generated years after the transactions. All three plaintiff exhibits which contain the general ledgers contain entries from "01/01/2002 to 5/31/2004," but each is time stamped "03/10/2006 4:01 pm." Moreover, the three plaintiff trial exhibits, which contain the general ledgers, are identical in form, and each only provides limited information. All three exhibits have the same headings for the transactions:

| Description | Trans Date | Type | Refer. | Debit Amount | Credit Amount | G/L Balance | Entry No. |
|---|---|---|---|---|---|---|---|

The first page of plaintiff's trial exhibit 13, the first exhibit which contains portions of the general ledgers, is included below to demonstrate their inadequacy.

25

A26

3/10/2006            Englewood Terrace Limited Partnership            Page 1
4:01 pm                    Ledger Detail
                       March 10, 2006

01/01/2002 to 05/31/2004

1110 to 9997

| Description | Trans Date | Type | Refer. | Debit Amount | Credit Amount | G/L Balance | Entry No. |
|---|---|---|---|---|---|---|---|
| * 1110 | | Petty Cash | | | | | |
| 1100  Beginning Balance | 01/01/2002 | | | | | 300.00 | |
| Petty Cash | 02/26/2002 | APIN | PETT002 | 300.00 | | 600.00 | 00007276 |
| Petty Cash | 02/26/2002 | APIN | PETT003 | 300.00 | | 900.00 | 00007276 |
| | | | | ----------------- | ------------------ | | |
| Total for 02/2002, Acct# 1110 | | | | 600.00 | 0.00 | | |
| Net Activity for the month: | | | | 600.00 | | | |
| Establishing Petty Cash Acct. | 10/02/2002 | APIN | DAMI001 | 300.00 | | 1,200.00 | 00009789 |
| | | | | ----------------- | ------------------ | | |
| Total for 10/2002, Acct# 1110 | | | | 300.00 | 0.00 | | |
| Net Activity for the month: | | | | 300.00 | | | |
| Establishing PC Acct.For S.Boe | 11/12/2002 | APIN | PETT004 | 500.00 | | 1,700.00 | 00009965 |
| Petty Cash | 11/14/2002 | APIN | DAMI001 | 100.00 | | 1,800.00 | 00009967 |
| Petty Cash | 11/14/2002 | APIN | PETT002 | 200.00 | | 2,000.00 | 00009967 |
| Petty Cash | 11/14/2002 | APIN | ANDE001 | 100.00 | | 2,100.00 | 00009967 |
| Petty Cash | 11/15/2002 | APIN | DAMI001 | 750.00 | | 2,850.00 | 00009968 |
| | | | | ------------------ | ------------------ | | |
| Total for 11/2002, Acct# 1110 | | | | 1,6500.00 | 0.00 | | |
| Net Activity for the month: | | | | 1,6500.00 | | | |
| Petty Cash | 05/07/2003 | APIN | DAMI001 | | 100.00 | 2,750.00 | 00011174 |
| | | | | - ----------------- | ------------------ | | |
| Total for 05/2003, Acct# 1110 | | | | 0.00 | 100.00 | | |
| Net Activity for the month: | | | | -100.00 | | | |
| Close S. Boyde Account | 07/25/2003 | MAN | PETTYCAS | | 672.19 | 2,077.81 | 00011768 |
| Establish Account for L. Nixon | 07/25/2003 | APIN | NIXO001 | 500.00 | | 2,577.81 | 00011793 |
| | | | | ----------------- | ------------------ | | |
| Total for 07/2003, Acct# 1110 | | | | 500.00 | 672.19 | | |
| Net Activity for the month: | | | | -172.19 | | | |
| **** 1110  Petty Cash | | | | 3,050.00 | 772.19 | 2,577.81 | |
| Net Activity on account 1110: | | | | 2,277.81 | | | |
| * 1120 | | Cash – Operating Acct | | | | | |
| 1120  Beginning Balance | 01/01/2002 | | | | | 11,997.84 | |
| Arberia Construction | 01/07/2002 | APCA | 1003 | | 1,500.00 | 10,497.84 | 00007099 |
| Lee Lumber & Building Material | 01/08/2002 | APCA | 1004 | | 340.06 | 10,157.78 | 00007100 |
| Menards | 01/11/2002 | APCA | 1006 | | 4,066.05 | 6,091.73 | 00007101 |
| Kuhl's True Value Hardware | 01/14/2002 | APCA | 1007 | | 1,294.28 | 4,797.45 | 00007102 |
| Lee Lumber & Building Material | 01/14/2002 | APCA | 1008 | | 497.57 | 4,299.88 | 00007102 |
| National Center for Housing Ma | 01/14/2002 | APCA | 1009 | | 990.00 | 3,309.88 | 00007102 |

26

Nowhere in the general ledgers or other evidence provided to the court is there supporting documentation for the information contained in the ledgers, nor does plaintiff cite to trial testimony which explains the general ledger entries. No more helpful are plaintiff's trial exhibits 12, 14, or 16, which appear to demonstrate the revenues from 2002, 2003 and 2004, respectively. As each of the headings for the 2002, 2003 and 2004 revenues note, however, they are: "Based on General Ledger." The court cannot rely on the information in plaintiff's trial exhibits 12, 14, or 16 as it cannot for plaintiff's trial exhibits 13, 15, or 17. Nor does the nearly 2,000 pages of documents filed as new, additional exhibits on January 31, 2013 and on February 13, 2013 following the remand, provide evidence of the expenses incurred by plaintiff as a result of the breach. The additional documents include, by way of examples: the financial requirements for closing, the loan closing statement for South Pointe, the building loan agreement, the October 29, 2002 payoff letter from Englewood to Standard Federal Bank, N.A., the December 6, 2002 Englewood Commitment Letter, the December 12, 2002 mortgage between Chicago Title and Trust Co. and Reilly Mortgage, the December 11, 2002 Owner-Architect Agreement between Englewood and T.D. Dunaj, the initial January 17, 2003, operating deficit disbursement approved by HUD, the February 10, 2003 Construction Loan Escrow Disbursing Agreement, the approved Advance of Escrow Funds from Reilly Mortgage to Englewood, the property liability insurance that Englewood did not pay in December 2003, Englewood's Applications for Insurance of Advance of Mortgage Proceeds, documents related to Reilly Mortgage's Foreclosure action in the Cook County, Illinois Court, Englewood's Breach of Contract complaint and cross-claim against Reilly Mortgage in the Cook County, Illinois Court, and duplicative copies of a number of the documents listed above. The submitted documents do not support plaintiff's claims for lost profits, as the documents fail to reveal any payments affirmatively made by plaintiff, but just offer further evidence that payments were made out of funds advanced by Reilly Mortgage or the Illinois Housing Department Authority.

In order to be awarded lost profits based on avoided costs and expenses, the plaintiff must demonstrate the avoided costs and expenses with reasonable certainty. See S. Nuclear Operating Co. v. United States, 637 F.3d at 1304; see also Bluebonnet Savings Bank F.S.B. v. United States, 67 Fed. Cl. at 238 ("[B]ecause plaintiffs in this case are seeking expectancy damages, it is incumbent upon them to establish a plausible 'but-for' world."). Plaintiff retains this burden as it is the party incurring the costs, and, therefore, "is in the best position to adduce and establish such proof." S. Nuclear Operating Co. v. United States, 637 F.3d at 1304 (internal quotation omitted). Plaintiff, however, has not offered such proof throughout the proceedings before this court, as its records are inadequate and unsupported. Despite the repeated offers, and even instructions by the court, for the parties to review and, if necessary, supplement the record, including instructing the defendant to file additional documentation after the remand, the plaintiff has not been able to demonstrate in the record avoided costs and expenses with reasonable certainty. The court agrees with the defendant that "Englewood offered, at best, inadequate evidence that it paid any of its obligations. This fact alone should bar the award of any damages." (emphasis in original). Plaintiff's general assertions that the mortgage proceeds directly and indirectly paid Englewood's expenses and, therefore, Englewood is entitled to recover for making

27

these payments does not justify an award to plaintiff.

In reviewing the record as a whole, this court, cannot determine which, if any, were costs not avoided by the breach. The record is replete with documents demonstrating payments made, as a result of funds advanced by Reilly Mortgage or the Illinois Housing Department Authority, but not by plaintiff. In furnishing incomplete records of its own payments, the plaintiff has placed itself in a position to receive no award at all. The documents produced at trial and the numerous documents submitted on remand do not meet plaintiff's burden. As noted repeatedly, throughout the many opinions issued in this case, defendant, indeed, breached the HAP contract. Plaintiff, however, has failed to provide necessary evidence to prove its damages as a result of that breach. Therefore, the original damages award in <u>Englewood V</u>, 94 Fed. Cl. 116, of $3,272,217.00 is reduced to zero. As plaintiff has failed to meet its obligation to offer evidence to demonstrate entitlement to damages, in accordance with the instructions of the Federal Circuit to review the proof and, if necessary, reduce the damages award, the court does not reach the issue of whether, or to what extent, plaintiff was obligated to make repairs to South Pointe or the costs of maintenance to ensure South Pointe remained in compliance of the HAP contract, or the routine operating expenses.

## CONCLUSION

Throughout the case, during pre-trial and trial proceedings, and even after the remand, plaintiff has struggled and has been unable to produce adequate and coherent records to support the claims filed in this court. Although the court recognizes that HUD breached the contract with plaintiff, and that there was a difficult history between the parties, both before and during the proceedings of the case, in light of the United States Court of Appeals for the Federal Circuit's instructions on remand, the HAP contract damages of $3,272,217.00, previously awarded to plaintiff by this court to account for breach damages, are reduced to zero.

**IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**

28

A29

# United States Court of Appeals
# for the Federal Circuit

*Englewood Terrace Limited v. US,* 2014-5045

## CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by NELSON KINDER + MOSSEAU PC, Counsel Press was retained by Don S. Samuelson, attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **April 21, 2014**, counsel for Appellant has authorized me to electronically file the foregoing **Brief for Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Douglas K. Mickle,
Senior Trial Attorney
Department of Justice
Commercial Litigation Branch
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
202-307-0383
douglas.mickle@usdoj.gov

Maria T. Baguio
Gregory G. Gustin
Lorraine C. Shoto
Department of Housing and Urban
Development
77 West Jackson Boulevard
Room 2617
Chicago, IL 60604
312-913-8242
maria.t.baguio@hud.gov
gregory.g.gustin@hud.gov
Lorraine.C.Shoto@hud.gov

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

April 21, 2014

/s/ John C. Kruesi, Jr.
Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  X   The brief contains  13,998  words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  X   The brief has been prepared in a proportionally spaced typeface using MS Word 2014  in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using _____ _____in a ___ characters per inch_____ font.

April 21, 2014_____    /s/ Don S. Samuelson
Date    DON S. SAMUELSON
    *Counsel for Appellant*