NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**ENGLEWOOD TERRACE LIMITED PARTNERSHIP, A MICHIGAN LIMITED PARTNERSHIP,**
*Plaintiff-Appellant*

v.

**UNITED STATES,**
*Defendant-Appellee*

---

2014-5045

---

Appeal from the United States Court of Federal Claims in No. 1:03-cv-02209-MBH, Judge Marian Blank Horn.

---

Decided: October 29, 2015

---

DREW G.A. PEEL, Rachlis Duff Adler Peel & Kaplan LLC, Chicago, IL, argued for plaintiff-appellant. Also represented by DON SAMUELSON, Law Offices of Don S. Samuelson, Lake Forest, IL.

DOUGLAS K. MICKLE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by STUART F. DELERY, ROBERT E. KIRSCHMAN, JR., KENNETH M. DINTZER; LORRAINE C. SHOTO, GREGORY G. GUSTIN, MARIA T. BAGUIO, United States Department of Housing and Urban Development, Chicago, IL.

---

Before DYK, MOORE, and WALLACH, *Circuit Judges*.

DYK, *Circuit Judge*.

This case is a breach of contract action brought by Englewood Terrace Limited Partnership ("Englewood") against the United States. In 2012, we held that the United States was liable for breach but remanded with instructions to determine Englewood's damages, including measuring and deducting from Englewood's lost revenues any costs or expenses it saved as a result of the breach. *Englewood Terrace Ltd. P'ship v. United States* (*Englewood VII*), 479 F. App'x 969, 973-74 (Fed. Cir. 2012). On remand, the Court of Federal Claims ("Claims Court") found that Englewood failed to produce sufficient evidence to enable determination of saved costs and expenses and held that Englewood was not entitled to any damages. *Englewood Terrace Ltd. P'ship v. United States* (*Englewood VIII*), 113 Fed. Cl. 718, 740-41 (2013). We *affirm*.

BACKGROUND

In 2000 Englewood and the United States Department of Housing and Urban Development ("HUD") executed a housing assistance payment ("HAP") contract providing rent subsidy payments to Englewood on behalf of its tenants in South Pointe Towers ("South Pointe"), an apartment building in Chicago, Illinois. *Englewood VII*, 479 F. App'x at 970. Englewood sued in the Claims Court

for breach of this contract, and the Claims Court awarded damages in the amount of lost revenues, *i.e.*, the rent subsidy payments that Englewood would have received under the contract. *Englewood Terrace Ltd. P'ship v. United States* (*Englewood II*), 79 Fed. Cl. 516, 551 (2007); *Englewood Terrace Ltd. P'ship v. United States* (*Englewood V*), 94 Fed. Cl. 116, 130 (2010). On appeal, we affirmed the Claims Court's determination that HUD had breached the HAP contract and that Englewood lost rental revenues of $3,272,217 as a result. *Englewood VII*, 479 F. App'x at 972. However, we vacated the damages award. The Claims Court had awarded Englewood lost rental revenues without deducting costs and expenses Englewood saved—*i.e.*, avoided paying—as a consequence of HUD's breach. We remanded to the Claims Court with instructions to determine Englewood's saved costs and expenses, deduct them from the lost revenues, and determine whether there were lost profits and, if so, their amount.

On remand, the Claims Court ordered the parties to identify saved expenses and costs. The government presented such a list, relying on Englewood's own financial records, which included major repairs totaling $3,514,568 and "other routine operating expenses" in the amount of $1,830,993, and argued that these expenses and costs should be deducted from revenues, with the result that there were no lost profits.

Englewood had not generated evidence concerning saved expenses in the original Claims Court proceedings, before the first appeal. On remand, though agreeing that repairs and operating costs were relevant categories of potentially saved expenses, Englewood declined to generate and present its own list of what it claimed were saved costs or expenses. Nonetheless, on November 20, 2012, the Claims Court reopened the record and gave Englewood another opportunity to produce necessary evi-

dence. Englewood submitted additional documents in early 2013 to supplement the record.

The Claims Court found Englewood's evidence insufficient to determine its saved expenses. "In reviewing the record as a whole, this court[] cannot determine which, if any, were costs not avoided by the breach." *Englewood VIII*, 113 Fed. Cl. at 740. The Claims Court noted that Englewood's primary evidence of payment consisted of summary entries from its general ledgers. The Claims Court found the ledgers inadequate to establish that Englewood had made any payments of expenses during the damages period, including any repairs (major or minor) to South Pointe or routine operating expenses. The Claims Court found Englewood's additional documentary evidence to be similarly insufficient and held that Englewood had failed to prove its avoided costs and expenses. Without reaching the question of whether the government's saved costs figures were correct, the Claims Court reduced the lost profits damages award to zero. Englewood appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review de novo conclusions of law by the Claims Court and review its factual findings for clear error. *Englewood VII*, 479 F. App'x at 972 (citing *Bell BCI Co. v. United States*, 570 F.3d 1337, 1340 (Fed. Cir. 2009)). Evidentiary rulings by the Claims Court are reviewed for abuse of discretion. *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1272 (Fed. Cir. 2008) (citations omitted).

A plaintiff seeking lost profits or expectation damages for breach of contract generally bears the burden to prove "what might have been." *Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001). We have previously held that, "[t]o recover lost profits for

ENGLEWOOD TERRACE LIMITED v. US                         5

breach of contract, the plaintiff must establish by a preponderance of the evidence . . . that . . . a sufficient basis exists for estimating the amount of lost profits with reasonable certainty." *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324–25 (Fed. Cir. 2002) (citations and internal quotation marks omitted).

In that connection, "a non-breaching plaintiff bears the burden of persuasion to establish both the costs that it incurred and the costs that it avoided as a result of a breach of contract." *Bos. Edison Co. v. United States*, 658 F.3d 1361, 1369 (Fed. Cir. 2011) (citing *S. Nuclear Operating Co. v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011)). Typically, the breaching party first prepares a "model of the non-breach world." *Bos. Edison Co.*, 658 F.3d at 1369–70; *see also S. Nuclear Operating Co.*, 637 F.3d at 1304; *Energy Nw. v. United States*, 641 F.3d 1300, 1307–08 (Fed. Cir. 2011). Once the defendant identifies expenses and costs that the plaintiff avoided as a result of the breach, the plaintiff "must incorporate them into a plausible model of the damages that it would have incurred absent the breach," or else it will fail to prove lost profits with sufficient certainty. *Bos. Edison Co.*, 658 F.3d at 1369. The Claims Court here found that Englewood failed to meet its burden, stating,

> This court has given the plaintiff at least four separate opportunities, over many years, to gather and submit to the court documentation that would establish its claims . . . . [P]laintiff's record-keeping, retention, and presentation has been limited, scattered and disorganized, despite the numerous opportunities provided by the court to bring plaintiff's evidence together in a proper evidentiary form for presentation in this court.

*Englewood VIII*, 113 Fed. Cl. at 732. The Claims Court concluded that Englewood's inability to prove its avoided costs and expenses precluded it from awarding damages.

On appeal Englewood does not dispute that it bore the burden of proof on saved expenses or that the government offered a model of the non-breach world. Rather, Englewood contends that its evidence established that there were no saved costs, entitling it to recover its lost revenues in their entirety. For simplicity's sake, we focus on the two largest expenses that the government submits were saved by Englewood as a result of HUD's breach: major repairs of South Pointe and routine operating expenses. These savings, allegedly amounting to $3,514,568 and $1,830,993, respectively, together far exceed Englewood's lost revenues of $3,272,217. The government's calculations were based on Englewood's own financial records and ledgers.

Although the Claims Court did not decide whether the government's calculations of these savings were correct, it held that Englewood had failed to meet its own burden to establish the amount (or the absence of) saved expenses. "The court agrees with the defendant that 'Englewood offered, at best, inadequate evidence that it paid *any* of its obligations. This fact alone should bar the award of any damages.'" *Englewood VIII*, 113 Fed. Cl. at 740 (emphasis in original).

Englewood argues on appeal that it provided evidence sufficient to prove it paid for major repairs and routine operating expenses. As to operating expenses it relies primarily on entries from its general ledgers. The Claims Court concluded that this evidence was inadequate. "[Englewood's] ledgers alone are not sufficient documentation." *Englewood VIII*, 113 Fed. Cl. at 737. The Claims Court noted that the ledger entries were generated years after the transactions they purport to record and include

no supporting documentation confirming payment was actually made to creditors.  Englewood cites *Kansas Gas & Electric Co. v. United States*, 685 F.3d 1361 (Fed. Cir. 2012), for the general proposition that ledger entries can suffice to prove lost profits.  Englewood is correct that there is no per se rule that lost profits cannot be proved with ledger entries.  But the Claims Court did not apply any per se rule, and, in any event, *Kansas Gas* is not analogous to the present case, as the evidence deemed sufficient there included detailed accounting records that complied with Federal Energy Regulatory Commission regulations.  *Id.* at 1369.  By contrast, Englewood has produced only post-dated summary ledger entries.  We see no clear error in the Claims Court's ruling that the general ledgers here were unreliable.

In addition to the ledger entries, Englewood presented trial exhibits summarizing its finances in 2002, 2003, and 2004, but the Claims Court dismissed these, noting that each exhibit was based on the same general ledgers.  The Claims Court also reviewed the additional documents added to the record on remand and concluded that these documents "fail to reveal any payments affirmatively made by plaintiff."  *Englewood VIII*, 113 Fed. Cl. at 740.  Englewood's ledgers are not corroborated by supporting evidence, *e.g.*, receipts or cancelled checks, proving that it actually made any payments.  Moreover, Englewood provided no authenticating testimony with respect to the ledgers.

With respect to repairs, Englewood relies on a certified contractor's requisition, a summary of construction payouts, and contractors' lien claims.  But there was no testimony that these documents represented the $3.5 million in major repairs.  Moreover, testimony from Englewood's representative, Donald Samuelson, makes clear that repairs paid out of the Reilly loan were not the same $3,514,568 in major repairs in the government's

model.  Mr. Samuelson stated, "[t]he reference to the major repairs were simply a conversation.  It was not a legal obligation by Englewood to do anything," Joint Appendix ("J.A.") 372, "[the $3.5 million in major repairs] were never paid," J.A. 384, and "[the repairs] were not made."[1]  J.A. 384.

When the government presented a plausible model of saved expenses that included $3,514,568 in major repairs to South Pointe, the burden shifted to Englewood to prove what repairs it had actually made.  The Claims Court found that Englewood failed to do so, having offered "no evidence or documentation of what repairs were made by Englewood during the damages period."  *Englewood VIII*, 113 Fed. Cl. at 736.

With respect to whether Englewood was obligated to make the major repairs, at one point Englewood appeared to admit that it had such an obligation, *see Englewood VIII*, No. 1:03-cv-02209-MBH, ECF No. 88-16, at 5 (Aug. 6, 2001 letter from Donald Samuelson), and, in any event, it never offered proof that there was no such obligation or

---

[1] "MR. SAMUELSON: Well, the major repairs that he referred to were discussed and outlined in August of 2001.
    THE COURT:  But they actually were expended or not?
    MR. SAMUELSON: No. They never materialized.
    THE COURT:  Okay.  So these dates we're talking about are just for the major repairs?
    MR. SAMUELSON: Yes.
    THE COURT: Let's be very precise, please.  But they were never paid.
    MR. SAMUELSON: They were never incurred.  They were not made, they were not incurred, they were not paid." J.A. 383–84.

that the obligation was limited. The Claims Court correctly concluded that, "[i]f plaintiff is unable to establish evidence of costs it would have been obligated to pay in a 'but for' world, the court will not be able to assess plaintiff's damages award." *Englewood VIII*, 113 Fed. Cl. at 732 (citing *inter alia Kan. Gas*, 685 F.3d at 1371; *Yankee Atomic*, 536 F.3d at 1273).

Despite its explicit concessions that it never paid for major repairs, Englewood suggests for the first time at oral argument that the $3,514,568 in repairs were encompassed and paid for by Englewood as part of the more than $7 million of construction carried out in 2003 and 2004 and paid out of the Reilly Mortgage loan (a non-recourse loan insured by HUD that Englewood secured in 2002 and on which Englewood ultimately defaulted). But Englewood's complete failure to advance that theory in the Claims Court constitutes a waiver. Even Englewood's reply brief fails to raise the theory and instead distinguishes costs and expenses paid from the Reilly loan from major repairs and routine operating costs, which it does not list as coming from the Reilly loan. Reply Brief at 8.

In summary, the Claims Court found that "plaintiff's repeated failure to keep, locate, and submit to the court adequate records has been a consistent problem throughout the above-captioned case, despite numerous opportunities accorded to plaintiff to identify and offer specific documentation, including now on remand." *Englewood VIII,* 113 Fed. Cl. at 737. We see no clear error in the Claims Court's determination that the fragmentary and inconsistent evidence provided by Englewood was generally insufficient to prove its costs and expenses. "In furnishing incomplete records of its own payments, the plaintiff placed itself in a position to receive no award at all." *Id.* at 740. Our court has recognized the authority of the Claims Court to award zero damages when the non-

breaching party fails to prove its lost profits with reasonable certainty.[2] Because Englewood failed to prove the expenses and costs savings element of its lost profits with reasonable certainty, the Claims Court was justified in awarding no damages.

For the foregoing reasons, we affirm the judgment of the Court of Federal Claims.

### AFFIRMED

Costs

Costs to the United States.

---

[2] *See, e.g.*, *Kan. Gas*, 685 F.3d at 1371 ("Without record evidence about the research costs in both worlds, the trial court could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the damages. . . . Thus, the Court of Federal Claims did not err in disallowing damages . . . .") (citations omitted); *Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005) ("The inability to prove by a preponderance of the evidence that profits would have been made but for the breach will therefore preclude recovery on a lost profits theory."); *Energy Nw.*, 641 F.3d at 1308; *Yankee Atomic*, 536 F.3d at 1273; *Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348, 1358 (Fed. Cir. 2001).